In the

# United States Court of Appeals
### For the Seventh Circuit

No. 01-3876

ILAH M. TINDER,

*Plaintiff-Appellant,*

v.

PINKERTON SECURITY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 00 C 170—**Barbara B. Crabb**, *Chief Judge.*

ARGUED JUNE 12, 2002—DECIDED SEPTEMBER 17, 2002

Before MANION, ROVNER, and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.* The principal issue presented in this appeal is what constitutes sufficient consideration to support an agreement in Wisconsin to arbitrate between an employer and an at-will employee. The appellant, Ilah M. Tinder, sued her former employer, Pinkerton Security, for employment discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* Citing what it claimed was an enforceable agreement to arbitrate the dispute, Pinkerton moved the district court under the Federal Arbitration Act ("FAA") to stay the trial proceedings and compel Tinder to arbitrate

her dispute. The district court granted the motion, concluding that the agreement was enforceable. Later, after Pinkerton prevailed at arbitration, the district court confirmed the arbitrator's award in favor of Pinkerton, and Tinder appeals. Because the district court correctly concluded that the agreement was enforceable under Wisconsin law and compelled arbitration, we affirm.

## I.

Tinder began employment with Pinkerton on October 21, 1996, and was assigned to work as a security officer at a General Motors facility in Janesville, Wisconsin. The following day, Tinder received a copy of Pinkerton's employee handbook and signed an "Employee Acknowledgment Form." The first paragraph made clear that the form was a contract for employment at-will:

> My employment by Pinkerton is strictly an employment at will terminable by either Pinkerton or myself at any time, in either party's sole discretion, without advance notice. No Pinkerton representative has authority to modify this policy. I understand that at no time may I rely on any policies, procedures, customs and/or statements, whether written or oral, to constitute a modification of this express condition of my employment.

The form further provided that the handbook was not to be construed as a supplement to or modification of the employment contract, and that Pinkerton reserved "the right to change its policies, rules 'at-will' employment policy as stated in Paragraph 1." When notifying its employees of policy or rule changes, Pinkerton typically inserts a "payroll stuffer" in the envelope with each employee's paycheck. Occasionally, notices of policy or rule

changes are accompanied by acknowledgment forms that employees were required to sign and return to management.

In October 1997, Pinkerton issued to all of its employees as a payroll stuffer a color brochure entitled "Pinkerton's Arbitration Program." The brochure announced that Pinkerton was instituting a mandatory arbitration program effective January 1, 1998, broadly covering all legal claims including discrimination under the federal civil rights statutes:

> Any claims or controversies . . . either Pinkerton may have against you or you may have against the Company or against its officers, directors, employees, or agents in their capacity as such, must be resolved by arbitration instead of the courts, whether or not such claims arise out of your employment (or its termination). The claims covered include, but are not limited to, . . . discrimination (including, but not limited to, race, sex, religion, national origin, age, marital status, or medical condition, handicap, or disability); . . . and claims for violation of any federal, state or other governmental law, statute, regulation, or ordinance. . . .

This language was clarified elsewhere in the brochure using a question-and-answer format. The brochure emphasized that the arbitration agreement would not bar employees from bringing legal claims, and that both the employees and the company were bound by the policy:

> Q. Do I lose any substantive rights under this program?

> A. No, your substantive legal rights remain intact. All that changes is that an arbitrator, rather than a judge or jury, will resolve the disputes.

* * *

    Q.  Is Pinkerton bound by these arbitration provisions?

    A.  Absolutely. Effective January 1, 1998, Pinkerton will be a binding arbitration company. This means that if Pinkerton has any claims against its employees, or ex-employees, it must also use binding arbitration under the same terms and conditions in Section II of this brochure.

The brochure stated that arbitrators would apply the same legal rules and would be authorized to award the same remedies as any court. Although the program provided that the company and the employee would split the arbitrator's fee, Pinkerton agreed to reimburse prevailing employees for their portion of the fee, or pay the entire fee if the law of the forum prohibited splitting the fee. The brochure also suggested that opting out of the program was not possible if the employee wished to remain on the job past the effective date of the policy:

    Q.  What if I do not want to be covered by this binding arbitration program?

    A.  Effective January 1, 1998, all employees, including the CEO, are covered by the program. By remaining employed at Pinkerton through the effective date, you are agreeing to be covered by the program and you waive your right to a court trial.

Near the end of the brochure, in a section captioned "Consideration," was a paragraph restating this answer in more traditional contract language, and providing that the mutual promises by Pinkerton and its employees to submit their claims to arbitration rather than litigation "provide consideration for each other. By remaining employed with Pinkerton through January 1, 1998, you are agreeing to waive your right to have a claim against the Company heard in a court of law." The brochure was

not accompanied by an acknowledgment form. As was stated in the brochure, Pinkerton implemented the arbitration program in January 1998.

Tinder did not recall receiving or seeing the arbitration brochure. Pinkerton produced two affidavits stating that Tinder received the brochure, however. The first affidavit, from Director of Employee Relations Kathy Rasmussen, asserted that Pinkerton's central office distributed copies of the brochure to each of its district offices with instructions to insert it as a payroll stuffer in the envelope along with each employee's paycheck. According to Rasmussen, Pinkerton sent a memorandum to its district office managers along with the brochures emphasizing the importance of the program and the need to promptly distribute the brochures. Rasmussen went on to aver that Pinkerton's legal department later issued a second memorandum confirming that the brochure had been distributed to all district offices. In the second affidavit, Mark Cruciani, manager of Pinkerton's district office in Milwaukee, asserted that Tinder was paid through his office; that his office distributed the brochure to all of its employees along with their paychecks on the payday following the date Pinkerton instructed its district offices to circulate the brochure; and that Tinder received her salary by check, not by direct deposit into a bank account.

In May 1998, Pinkerton undertook an internal campaign to remind its employees that the arbitration policy had been implemented. First, Pinkerton featured the program on the cover of the May 1998 issue of its internal monthly magazine, *Excellence in Service*. The cover story was a one-page article summarizing the reasons why Pinkerton instituted the policy, and reminding employees that the policy was in effect and applied to all employees who continued to work for or joined Pinkerton after January 1,

1998. Pinkerton also distributed a poster for display in all work sites that declared "Arbitration: It's fair, it's convenient, and it's policy." Finally, Pinkerton distributed a payroll stuffer to all of its employees entitled "Settling Disputes Through Arbitration." The stuffer reiterated the terms of the original brochure announcing the program.

In fall 1998, Tinder verbally complained to her supervisor, Bradley Bastain, that she believed she was the victim of gender discrimination on the job. Tinder complained that, unlike her male co-workers, she was required to work overtime, was not promptly paid for her work, and was not reimbursed for her purchase of boots for her uniform. Instead of taking action to remedy Tinder's complaints, Bastain admonished Tinder that he was tired of hearing her "continual complaints to upper management." In November 1998, Bastain informed Tinder that he was removing her from her assigned post, and warned her that her work hours would be reduced if she continued to complain about her work environment. Tinder alleged that after this, Bastain reduced her pay and refused to accommodate her request to take Sundays off so she could attend religious services. She interpreted these actions as retaliation for complaining about discrimination. Shortly after these events, Tinder quit.

Claiming constructive discharge and retaliation in violation of Title VII, Tinder filed charges with the United States Equal Employment Opportunity Commission, received a right-to-sue letter, and timely filed this lawsuit in March 2000. Pinkerton immediately moved to stay proceedings and compel arbitration, asserting that Tinder had agreed by way of a written agreement to arbitrate her claims, and that the agreement constituted an enforceable contract. Tinder denied that the policy was enforceable, arguing that there was no consideration for any

agreement by her to forego suing, and that she was un-aware of the existence of the policy. The district court agreed with Pinkerton, however, granted the motion to stay, and ordered the parties to arbitrate. The court concluded that Tinder was an at-will employee, and that Pinkerton's policy was an agreement supported by mutual promises to arbitrate. The court also determined that Tinder's claim that she had no notice of the policy was untenable in light of Rasmussen's and Cruciani's affidavits.

Arbitration concluded in April 2001 with a ruling in Pinkerton's favor. Pinkerton then moved the district court to confirm the arbitrator's award. Over Tinder's objections, the district court confirmed the award and entered judgment in Pinkerton's favor.

## II.

Tinder argues that any agreement she made to submit her claims to arbitration was not supported by valid consideration. She also contends that the district court erred in compelling her to arbitrate because she had no notice of the policy's implementation; she neither signed any acknowledgment agreeing to be bound nor was she allowed to opt out; the policy was not implemented until after she began employment with the company; and the contract is illusory. We review *de novo* the district court's decision to compel arbitration based on its finding that an enforceable arbitration agreement existed between the parties. *Gibson v. Neighborhood Health Clinics*, 121 F.3d 1126, 1130 (7th Cir. 1997).

The FAA mandates enforcement of valid, written arbitration agreements. 9 U.S.C. § 2; *Circuit City Stores v. Adams*, 532 U.S. 105, 111-12 (2001). To give effect to the federal policy favoring private arbitration, the FAA provides for

stays of litigation when an issue presented in the case is referable to arbitration. 9 U.S.C. § 3; *EEOC v. Waffle House, Inc.*, 122 S. Ct. 754, 761-62 (2002). Employment discrimination claims arising under Title VII are issues referable to arbitration. *See Koveleskie v. SBC Capital Markets, Inc.*, 167 F.3d 361, 364 (7th Cir. 1999); *Perez v. Globe Airport Security Serv's, Inc.*, 253 F.3d 1280, 1284 (11th Cir. 2001); *Hooters of America, Inc. v. Phillips*, 173 F.3d 933, 937 (4th Cir. 1999); *Patterson v. Tenet Healthcare, Inc.*, 113 F.3d 832, 837 (8th Cir. 1997). We evaluate agreements to arbitrate under the same standards as any other contract. *Metro East Center for Conditioning & Health v. Qwest Communications Internat'l, Inc.*, 294 F.3d 924, 927 (7th Cir. 2002); *Penn v. Ryan's Family Steak Houses, Inc.*, 269 F.3d 753, 758 (7th Cir. 2001). Whether a binding arbitration agreement exists is determined under principles of state contract law. 9 U.S.C. § 2; *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Because all relevant events occurred in Wisconsin, Wisconsin law determines the validity of the agreement. *Michalski v. Circuit City Stores, Inc.*, 177 F.3d 634, 636 (7th Cir. 1999).

Although no reported case in Wisconsin has addressed what constitutes an enforceable agreement to arbitrate, Wisconsin courts treat contracts concerning employment like any other contract. *See Ferraro v. Koelsch*, 368 N.W.2d 666, 671-72 (Wis. 1985). This includes agreements formed subsequent to an employment at-will that supplant or alter the nature of the employment relationship. In such a case, to be enforceable the agreement must be supported by consideration. *Id.* at 672-73. In Wisconsin, consideration consists of either a detriment to the promisor or a benefit to the promisee. *See Michalski*, 177 F.3d at 636 (citing *NBZ, Inc. v. Pilarski*, 520 N.W.2d 93, 96 (Wis. Ct. App. 1994)). A promise for a promise, or the exchange of promises, is adequate consideration to support a bilateral contract.

*Ferraro*, 368 N.W.2d at 671-72. An employer's promise to arbitrate in exchange for an employee's promise to do the same constitutes sufficient consideration to support the arbitration agreement. *Michalski*, 177 F.3d at 636.

Tinder points out, however, that Pinkerton unilaterally implemented its arbitration program without input from her or its employees. This, she argues, shows that she never promised to arbitrate her dispute. But Pinkerton's unilateral decision to implement the program does not demonstrate that Tinder did not agree to be bound. The agreement provided expressly that by remaining employed at Pinkerton after the effective date of the arbitration program Tinder, like all other employees, agreed to submit her claims to arbitration. Wisconsin recognizes that, because at-will employees are free to quit their jobs at any time, at-will employees give adequate consideration for employer promises that modify or supplant the at-will employment relationship by remaining on the job. *See Ferraro*, 368 N.W.2d at 673 n.5; *Pincus v. Pabst Brewing Co.*, 893 F.2d 1544, 1549 (7th Cir. 1990) (citing *Prochniak v. Wisconsin Screw, Inc.*, 61 N.W.2d 882, 885 (Wis. 1953)). Tinder remained on the job past the effective date of the program. Doing such evidenced her mutual promise to arbitrate her disputes with Pinkerton.

Tinder also contends that our decisions in *Gibson* and *Michalski* establish that a promise of continued employment cannot constitute sufficient consideration to support a promise to arbitrate. We disagree. Although *Gibson* was decided under Indiana law and is not helpful in determining the content of Wisconsin law, we recognized that an employer's promise to continue employing an at-will employee could constitute consideration for an employee's promise to forego certain rights. *See* 121 F.3d at 1131-32. Additionally, *Gibson* is distinguishable from this case

because the employer never promised to continue employing the plaintiff in exchange for her waiving her right to sue. *Id.* at 1132. And *Michalski*, which arose under Wisconsin law, did not address whether continued at-will employment may constitute consideration for an agreement to arbitrate. The question in *Michalski* was whether the employer had promised to arbitrate in exchange for the employee's agreement to do the same. The written agreement was silent whether the employer was bound to arbitrate. Based on our review of other documents in the record, we concluded, over a dissent, that the employer was bound by the agreement. Unlike *Michalski*, the controlling document in this case states expressly that Pinkerton is bound by the agreement.

In further arguing that there existed no consideration to support her agreement to forego her right to sue, Tinder relies on *NBZ, Inc. v. Pilarski, supra*, 520 N.W.2d 93 (Wis. Ct. App. 1994), where Wisconsin's intermediate appellate court concluded that a covenant not to compete, executed after employment began, was unenforceable for lack of consideration. But *Pilarski* does not support Tinder's position. The employer in *Pilarski* could identify no clear policy whether employees were required to sign covenants not-to-compete in exchange for employment—the company's president stated that he did not know what he would do if an employee refused to sign the agreement. *See id.* at 97. In contrast, the policy in this case was conditioned explicitly on continued employment, and applied to all employees.

Tinder next maintains that she did not receive the brochure announcing Pinkerton's arbitration program and did not know that the program existed until she sued. In her view, because Pinkerton failed to make adequate efforts to ensure that she knew about the program, she

never promised to do anything and should have been allowed to proceed to trial on her discrimination claims. Pinkerton argues that Tinder's claim that she does not recall receiving or seeing the arbitration brochure does not place any facts concerning the agreement at issue. Pinkerton also contends that it submitted sufficient evidence demonstrating that Tinder did in fact receive the brochure. Since Tinder failed to controvert its evidence, Pinkerton asserts that the district court properly discounted Tinder's claims and ordered arbitration.

A district court must promptly compel arbitration once it is satisfied that the parties agreed to arbitrate. 9 U.S.C. § 4. But if the district court determines that the making of the arbitration agreement is seriously disputed, "the court shall proceed summarily to the trial thereof." *Id.* The issue then is not whether Tinder's denial of having received notice of the policy is sufficient to avoid arbitration, but whether she produced sufficient evidence to raise a factual issue concerning whether she and Pinkerton are bound by a contract to arbitrate.

The party opposing arbitration must identify a triable issue of fact concerning the existence of the agreement in order to obtain a trial on the merits of the contract. *Saturday Evening Post Co. v. Rumbleseat Press, Inc.,* 816 F.2d 1191, 1196 (7th Cir. 1987). The FAA does not expressly identify the evidentiary standard a party seeking to avoid compelled arbitration must meet. But courts that have addressed the question have analogized the standard to that required of a party opposing summary judgment under Rule 56(e) of the Federal Rules of Civil Procedure: the opposing party must demonstrate that a genuine issue of material fact warranting a trial exists. *See Doctor's Associates, Inc. v. Distajo,* 107 F.3d 126, 129-30 (2d Cir. 1997); *Great Western Mortgage Corp. v. Peacock,* 110

F.3d 222, 231 n.36 (3d Cir. 1997); *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1154 (5th Cir. 1992). Just as in summary judgment proceedings, a party cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests; the party must identify specific evidence in the record demonstrating a material factual dispute for trial. *Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995).

In deciding whether the party opposing summary judgment (and by analogy compelled arbitration) has identified a genuine issue of material fact for trial, "the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). But Tinder's only evidence that she never received notice of the program was her own affidavit in which she avers that she "does not recall seeing or reviewing the Arbitration Program brochure that Defendant alleges was included with her payroll check in October, 1997," and this does not raise a genuine issue of material fact. Tinder asserted only that she does not remember receiving or seeing the brochure, whereas the uncontroverted affidavits of Kathy Rasmussen and Mark Cruciani indicate that the brochure was definitely sent and presumably received with her paycheck. Tinder's affidavit thus does not raise a genuine issue whether the brochure was distributed to her. *See Unterreiner v. Volkswagen of America, Inc.*, 8 F.3d 1206, 1211 (7th Cir. 1993); *Schroeder v. Copley Newspaper*, 879 F.2d 266, 269 n.1 (7th Cir. 1989); *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir. 1983); *I.V. Services of America, Inc. v. Inn Development & Management, Inc.*, 182 F.3d 51, 55 (1st Cir. 1999); *English v. Pabst Brewing Co.*, 828 F.2d 1047, 1050 (4th Cir. 1987). Moreover, Tinder

suggested in her pleadings that she was aware of the employee magazine article and did not mention whether she saw the posters or subsequent payroll stuffer. The district court therefore correctly compelled arbitration without a trial on whether a contract was formed.

Finally, we reject Tinder's remaining arguments. She contends that the arbitration policy is unenforceable because the program did not exist at the time she was hired, but agreements implemented in the course of an at-will employment are enforceable if independently supported by consideration. *Michalski*, 177 F.3d at 635; *Ferraro*, 368 N.W.2d at 673. Tinder also contends that the policy is unenforceable because she did not sign anything acknowledging the policy, and was not allowed to opt out of the policy while continuing to work. Although § 3 of the FAA requires arbitration agreements to be written, it does not require them to be signed. *Valero Refining, Inc. v. M/T Lauberhorn*, 813 F.2d 60, 64 (5th Cir. 1987). Furthermore, an employee's written acceptance of an employer's policies is not a prerequisite to enforceability under Wisconsin law, *Ferraro*, 368 N.W.2d at 669 n.2, and we have enforced arbitration agreements lacking opt-out provisions, *see Michalski*, 177 F.3d at 636; *cf. Metro East Center for Conditioning & Health*, 294 F.3d at 927-28 (arbitration clause contained in tariff on file with Federal Communications Commission was enforceable against plaintiff, even though terms of tariff were non-negotiable and plaintiff had no power to alter the tariff). Tinder also asserts that Pinkerton's promises were illusory because Pinkerton reserved the right to modify or terminate its policies at any time. But a valid arbitration agreement exists, and both parties are bound by it. *See Ferraro*, 368 N.W.2d at 164-66.

### III.

Because Tinder continued her at-will employment past the effective date of the arbitration policy, and because Pinkerton agreed to bind itself to the arbitration policy, we conclude that adequate consideration supported Tinder's agreement to arbitrate, and the agreement was enforceable under Wisconsin law. The district court therefore correctly compelled Tinder to submit her Title VII claims to arbitration. The judgment of the district court is

AFFIRMED.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*