**SMARTTEXT CORPORATION,**
Plaintiff,

v.

**INTERLAND, INC. and KFKI Systems, Inc., Defendants.**

No. 03–2393–JWL.

United States District Court,
D. Kansas.

Dec. 18, 2003.
As Corrected Nunc Pro Tunc
Dec. 19, 2003.

Rian F. Ankerholz, Ankerholz & Smith, Overland Park, KS, Robert Edward Murphy, Murphy, Taylor, Siemens & Elliott, PC, St. Joseph, MO, for Plaintiff.

Daniel D. Crabtree, Stinson, Morrison, Hecker, LLP–Overland Park, Overland Park, KS, for Defendants.

### *MEMORANDUM AND ORDER*

LUNGSTRUM, District Judge.

Plaintiff filed this diversity suit against defendants asserting claims of negligence, misrepresentation, breach of contract and deceptive practices in violation of the Kansas Consumer Protection Act, K.S.A. § 50–623 et seq. This matter is presently before the court on defendant Interland, Inc.'s motion to dismiss plaintiff's complaint and compel arbitration or, in the alternative, to transfer the case to the United States District Court for the Northern District of Georgia (doc. # 3). As set forth in more detail below, defendant's motion is retained under advisement until such time as a jury resolves the issue of whether an agreement to arbitrate was made. If the jury finds that no such agreement was made, then the court will deny defendant's motion; if the jury finds that an agreement was made, then the court will grant defendant's motion and will issue an order directing the parties to proceed to arbitration on all of plaintiff's claims, as explained more fully below. *See* 9 U.S.C. § 4.

### I. Background

Plaintiff SmartText Corporation ("SmartText") is in the business of selling proprietary business forms to a worldwide customer base. SmartText's products are sold and distributed primarily over the Internet through SmartText's two websites, *www.teneron.com* and *www.smartagreements.com*. The smartagreements.com website is the primary source of sales of products for SmartText as well as the primary means by which SmartText collects revenues and delivers software products to its customers. The teneron.com website was a portal website used by SmartText customers to access the software products available on the smartagreements.com website.

Prior to December 2001, SmartText had an oral agreement with Interliant, Inc. (an entity that is unrelated to defendant Interland, Inc.), a web hosting company, whereby Interliant was paid a monthly fee to host SmartText's two websites. In December 2001, defendant Interland purchased certain customer accounts of Interliant, Inc., including the SmartText account. Thereafter, Interland decided to migrate the websites of the customers whose accounts Interland had purchased from Interliant servers located at the Interliant data center to Interland servers located at Interland's data center in At-

lanta, Georgia. Toward that end, in January 2002, Interland notified SmartText that Interland would be migrating the teneron.com website and the smartagreements.com website from the servers at Interliant to Interland's servers.

According to plaintiff, it is the custom and practice in the web hosting industry to operate customer websites in parallel during a migration of customer websites so that the old website is not shut down until the new website has been tested and proven to be fully operational. Thus, Interland, in the course of migrating SmartText's websites to Interland's servers, was expected to prepare a new web site on its servers that was the mirror image of the current web site on Interliant's servers. Interland would not begin hosting the new website until SmartText reviewed and approved the "mirror" website and only then would the website on Interliant's servers be shut down. This approach ensures that the migration of any website to a new hosting company does not result in any "down time" for the website.

In early January 2002, Interland began the migration of SmartText's teneron.com website. On January 7, 2002, Interland completed its preparation of the mirror website for teneron.com on Interland's servers and sent an e-mail to Robert J. Sherwood, SmartText's CEO, indicating that he should review the mirrored website and indicate whether the site was acceptable. When Interland did not hear back from Mr. Sherwood, it sent another e-mail message to him. The message stated:

Dear Robert Sherwood:

Welcome to Interland! We look forward to serving all of your Web needs.

Five days ago we sent you an e-mail message asking you to review your newly mirrored Web site, teneron.com, at the following link: 209.35.192.231.

Our records show that you still have not visited the link to review your Web site.

If we still have not heard from you within five more days, we will assume that the mirrored site is correct and redirect your domain to point to your site hosted at Interland. In this event you will be deemed to have accepted your new hosting plan and Interland's Terms of Service.

If you do not find any issues with your Web site, please click the "Accept" button on the Web site review page located at http://216.25.10.13.customers/accept.asp?ID=13460. By accepting your new site, you are accepting all the parameters of your new hosting solutions as well as Interland's Terms of Service, which can be viewed at *http://www.interland.com/interliantmapping*.

If you discover issues with your Web site, please click the "Decline" button on the Web site review page. An Interland consultant will contact you within 24 hours to resolve your concerns.

In response to this e-mail, Mr. Sherwood clicked the "Decline" button on January 19, 2002. He subsequently contacted Interland to discuss the problems with the mirrored website.

According to Interland, it corrected the problems highlighted by Mr. Sherwood and then, on January 22, 2002, sent Mr. Sherwood another e-mail message asking him to review the corrected site and then accept or decline the site. Specifically, the e-mail stated, in pertinent part:

Dear Robert Sherwood:

Thank you for having taken the time to review your Web site, teneron.com, and submit the feedback on the areas that needed to be corrected. We have worked to resolve all the issues you originally encountered and ask that you carefully review your site one more time to ensure it is fully functional. You can access your site at: 209.35.192.231.

If your Web site is functioning properly, please click the "Accept" button on the Web site review page located at http://216.25.10.13.customers/accept. asp?ID=13460. By accepting your new site, you are accepting all the parameters of your new hosting solutions as well as Interland's Terms of Service, which can be viewed at *http://www.interland.com/interliantmapping.*

If your Web site requires further revisions, please click the "Decline" button on the Web site review page. An Interland consultant will contact you within 24 hours to resolve your concerns.

Please note, at this time your site visitors are still being directed to your existing Web site in the Interliant data center. Visitors will not be directed to your new Web site until you acknowledge that it is operating correctly via the method outlined above. If we do not hear from you within five days of this notice, we will assume your site is acceptable and will activate it on an Interland server.

Interland received no response from Mr. Sherwood and, thus, sent him another e-mail on or about January 27, 2002.

In its January 27, 2002 e-mail to Mr. Sherwood, Interland again asked Mr. Sherwood to review the updated mirrored site of teneron.com. In relevant part, the e-mail message to Mr. Sherwood stated as follows:

Five days ago we sent you an e-mail message asking you to review your newly mirrored Web site, teneron.com, at the following link: 209.35.192.231.

Our records show that you still have not visited the link to review your Web site.

**If we still have not heard from you within five more days, we will assume that the mirrored site is correct and redirect your domain to point to your site hosted at Interland. In this event you will be deemed to have accepted your new hosting plan and Interland's Terms of Service.**

If you do not find any issues with your Web site, please click the "Accept" button on the Web site review page located at http://216.25.10.13.customers/accept. asp?ID=13460. By accepting your new site, you are accepting all the parameters of your new hosting solutions as well as Interland's Terms of Service, which can be viewed at *http://www.interland.com/interliantmapping.*

If you discover issues with your Web site, please click the "Decline" button on the Web site review page. An Interland consultant will contact you within 24 hours to resolve your concerns.

(emphasis added). On January 31, 2002, Mr. Sherwood had neither clicked "Accept" nor "Decline" and, apparently, had not responded to the e-mail in any other manner.[1] Thus, on January 31, 2002, Interland deemed SmartText to have accepted the new site as well as Interland's Terms of Service. Interland then redirected the domain for teneron.com to Interland's server, causing the mirrored website to be "live" on the Internet, and provided web hosting services to the teneron.com website subject to Interland's Terms of Service.

Interland's Terms of Service include a forum selection clause as well as a mandatory arbitration provision. Specifically,

---

1. SmartText asserts in its brief that Mr. Sherwood did respond to the e-mail via direct communication with Interland concerning additional problems with the website, but SmartText fails to assert when this communication occurred. Plaintiff's complaint indicates that this communication occurred on February 7, 2002–after the time when Interland had shut down the teneron.com website on Interliant's server and had started hosting the site on its own server.

section 15(b) of Interland's Terms of Service states, in pertinent part, that "[a]ny suit, action or proceeding concerning this agreement must be brought in a Georgia state or federal court located in Fulton County, Georgia, and each of the parties hereby irrevocably consents to the exclusive jurisdiction of such court . . . in any such suit, action or proceeding." Section 15(c) of Interland's Terms of Service states, in pertinent part, that "[n]otwithstanding Section 15(b) above, each party agrees that any dispute between the parties arising out of this Agreement or in any manner relating to the Services must be submitted by the parties to arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association before a single arbitrator, appointed in accordance with such rules, who shall render a reasoned opinion. . . . Any action filed by either party in any court in violation of this Section should be dismissed pursuant to this Section."

On February 7, 2002, Mr. Sherwood advised Interland of some problems with the teneron.com website and expressed concern about the planned migration of the smartagreements.com website. Specifically, Mr. Sherwood stated that, in light of the fact that the smartagreements.com website functioned as SmartText's e-commerce website, SmartText "could not afford to have this site go through the same serious problems that our other sites are experiencing now." He specifically requested that Interland assign to the smartagreements.com migration project someone "absolutely familiar with commerce site migration and the importance of the customary parallel operation prior to going live."

In mid-February 2002, Interland began the process of migrating the smartagreements.com website. According to plaintiff, Interland encountered numerous problems in the migration process and was ultimately unable to complete the migration successfully. Throughout February and March 2002, Mr. Sherwood reiterated to Interland the importance of having the current smartagreements.com website remain operational until the mirrored site was completely operational in order to avoid an interruption in SmartText's hosting service. On several occasions, both defendant Interland and defendant KFKI Systems, Inc. (a company that was hired by Interland to provide expertise in the migration of websites from Interliant servers to Interland servers) assured Mr. Sherwood that the Interliant server would not be shut down until the new website was fully operational and tested.

On April 2, 2002, Interland sent an e-mail message to Mr. Sherwood announcing that the smartagreements.com site had been mirrored to a server at Interland's data center and asking Mr. Sherwood to review the site for any problems. Much like the previous e-mails with respect to the teneron.com website, this e-mail advised Mr. Sherwood that his customers were still being directed to the existing website on Interliant's servers but that his customers would be redirected to the new site on Interland's servers if Mr. Sherwood clicked the "Accept" button on the Web site review page or if Interland did not hear from Mr. Sherwood within five days. Mr. Sherwood responded to the e-mail message on that same day, April 2, 2002, and notified Interland that the mirrored site simply did not work. Nonetheless, according to plaintiff, Interland shut down the smartagreements.com website on the Interliant server on April 2, 2002 and the website was not operational as of that date.

Thereafter, plaintiff filed this lawsuit asserting claims of negligence and misrepresentation against both defendants for damages plaintiff allegedly sustained as a

result of the premature deactivation of the smartagreements.com website. Plaintiff also asserts a breach of contract claim against defendant Interland alleging that Interland breached an oral contract with plaintiff whereby Interland was required to successfully migrate both of plaintiff's websites to Interland's servers. Finally, plaintiff asserts a claim under the Kansas Consumer Protection Act against both defendants in connection with the migration of both websites.

## II. Discussion

In its motion, defendant Interland asserts that the court must dismiss plaintiff's complaint and compel arbitration consistent with the mandatory arbitration provision in Interland's Terms of Service. In the alternative, Interland moves this court to transfer the case to the United States District Court for the Northern District of Georgia consistent with the forum selection clause in Interland's Terms of Service. In support of its motion, Interland asserts that SmartText accepted Interland's Terms of Service by failing to respond to Interland's January 27, 2002 e-mail with respect to the teneron.com website and thereafter accepting the benefits of Interland's web hosting services. Interland further asserts that the arbitration provision found in Interland's Terms of Service is broad enough to cover disputes not only with respect to the teneron.com website but also with respect to the smartagreements.com website despite the fact that SmartText did not separately accept the Terms of Service in connection with the smartagreements.com website.

### A. Standard

■ The Courts of Appeals have uniformly held that "[i]n the context of motions to compel arbitration brought under the Federal Arbitration Act ('FAA'), 9 U.S.C. § 4 (2000), courts apply a standard similar to that applicable to a motion for summary judgment." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir.2003) (applying a summary-judgment-like standard in ruling on a motion to compel arbitration); *see, e.g., Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir.2002) (same); *Par–Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 n. 9 (3d Cir.1980) (same); *Brown v. Dorsey & Whitney, LLP*, 267 F.Supp.2d 61, 66–67 (D.D.C. 2003) (collecting case law on this issue and providing a helpful explanation of why the summary judgment standard applies); *Doctor's Assoc., Inc. v. Distajo*, 944 F.Supp. 1010, 1014 (D.Conn.1996) (same), *aff'd*, 107 F.3d 126 (2d Cir.), *cert. denied*, 522 U.S. 948, 118 S.Ct. 365, 139 L.Ed.2d 284 (1997). Although the Tenth Circuit has not precisely addressed this issue, there is no reason to believe that it would apply a different legal standard. *See, e.g., Gibson v. Wal–Mart Stores, Inc.*, 181 F.3d 1163, 1166 (10th Cir.1999) (reviewing the district court's grant of a motion to compel arbitration under the summary judgment standard where the parties agreed that standard applied); *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1283 (10th Cir.1997) (holding the district court must hold a jury trial on the existence of the agreement to arbitrate where the parties raise genuine issues of material fact regarding the making of the agreement to arbitrate (citing *Par–Knit Mills*, 636 F.2d at 54 & n. 9)); *see also, e.g., Phox v. Atriums Mgmt. Co., Inc.*, 230 F.Supp.2d 1279, 1282 (D.Kan. 2002) (applying a summary-judgment-like standard to a motion to compel arbitration); *Klocek v. Gateway, Inc.*, 104 F.Supp.2d 1332, 1336 (D.Kan.2000) (same).

Under this well-settled standard, summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demon-

strating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir.2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The movant need not negate the other party's claim, but rather must simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir.2000) (citing *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir.1998)). In the context of a motion to compel arbitration, this requires the defendant to present evidence sufficient to demonstrate an enforceable agreement to arbitrate. *See Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir.1995); *Phox*, 230 F.Supp.2d at 1282; *Klocek*, 104 F.Supp.2d at 1336.

Once the defendant has done this, the burden shifts to plaintiff to demonstrate a genuine issue of material fact as to the making of the agreement to arbitrate. *See Bensadoun*, 316 F.3d at 175; *Oppenheimer*, 56 F.3d at 358. To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Adams*, 233 F.3d at 1246. If the plaintiff demonstrates a genuine issue of material fact, then a trial on this issue is required. 9 U.S.C. § 4 (if the making of the arbitration agreement is seriously disputed, then "the court shall proceed summarily to the trial thereof"); *Avedon Eng'g*, 126 F.3d at 1283 (holding the district court must hold a jury trial on the existence of the agreement to arbitrate where the parties raise genuine issues of material fact regarding the making of the agreement to arbitrate).[2]

## B. Did SmartText accept Interland's Terms of Service with respect to the Teneron.com Website?

■ Interland contends that SmartText accepted Interland's Terms of Service by failing to respond to Interland's January 27, 2002 e-mail with respect to the teneron.com website and thereafter accepting the benefits of Interland's web hosting services. Interland's argument is based on one of the alternative provisions set out in the Restatement (Second) of Contracts § 69. That provision, subsection (1)(a), provides as follows:

> (1) Where an offeree fails to reply to an offer, his silence and inaction operate as an acceptance in the following cases only:
>
>> (a) Where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation.

Restatement (Second) of Contracts § 69(1)(a). This provision is consistent with the law of Kansas[3] and with generally recognized principles of contract law.

---

2. While defendant couches its motion in terms of a 12(b)(3) motion to dismiss for improper venue, defendant had apparently anticipated that the court would apply a summary-judgment-like standard because it has submitted matters outside the pleadings for the court's consideration. Plaintiff, on the other hand, has not submitted materials outside the pleadings. Nonetheless, plaintiff is not prejudiced by the court's adopting of this standard because defendant, as will be explained, has not met its burden of showing an enforceable agreement.

3. Both parties rely on Kansas cases in their briefs and neither party suggests that there is a choice-of-law issue in this case. In the absence of any suggestion from the parties that Kansas law is inapplicable, and because state contract law principles concerning the formation of contracts generally govern whether parties have agreed to arbitrate, the court looks to Kansas law. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).

See *Caterpillar Tractor Co. v. Sickler,* 149 Kan. 457, 460, 87 P.2d 503 (1939) (mere silence when an offer is made does not constitute an acceptance of the offer; something more than mere silence is required); Joseph M. Perillo, *Corbin on Contracts* § 3.21 at 415 (1993) ("It is clear that a party will not be permitted to receive and enjoy benefits, knowing that they are being offered at a price, without paying for them, if there was an opportunity to reject them without any expense or material inconvenience when they were offered" and silence in such circumstances may constitute acceptance); E. Allan Farnsworth, *Contracts* § 3.15 at 155 (2d ed.1990) (reciting general rule that a promise will not be inferred from the offeree's mere inaction).

In *Caterpillar Tractor,* for example, the Kansas Supreme Court held that there was ample evidence to support the trial court's conclusion that a farmer and the landlord from whom the farmer leased real property had agreed to eliminate the provision for a payment of cash rent after the first year of the original lease. 149 Kan. at 459, 87 P.2d 503. At trial, the farmer testified that, after the first year of the original lease, he had told the landlord that he would not pay any more cash rent (but would continue to pay him one-third of all crops produced on the land) and that, in response, the landlord simply told him to "go ahead and farm the place." *Id.* at 459–60, 87 P.2d 503. The trial court found that the landlord was not entitled to any cash rent after the first year of the original lease. *Id.* at 459, 87 P.2d 503. On appeal, the landlord argued that the evidence at trial demonstrated only that he remained silent when the farmer told him that he would not pay any cash rent. *Id.* at 460, 87 P.2d 503. The Kansas Supreme

Court rejected this argument and held that the landlord had not merely remained silent. Rather, the landlord, by his silence, had permitted the farmer to expend time and money in putting in a crop after the farmer had advised him that he would not pay any more cash rent and he clearly accepted the benefits of the farmer's efforts. *Id.* Moreover, the trial record reflected that after the farmer indicated that he would not pay any cash rent, he continued to farm the land for four or five years and no payment of cash rent was ever demanded by the landlord. *Id.* In such circumstances, the landlord was deemed to have accepted the modification of the lease "by conduct or acquiescence." *Id.*

Interland suggests that the facts of this case fall squarely within the Kansas Supreme Court's holding in *Caterpillar Tractor* in that SmartText not only failed to respond to the January 27, 2002 e-mail but thereafter accepted the benefits of Interland's web hosting services with knowledge that Interland would provide those services only if SmartText agreed to Interland's Terms of Service. Unlike the circumstances in *Caterpillar Tractor,* however, the parties in this case dispute whether SmartText willingly enjoyed or accepted the benefits of Interland's services.[4] SmartText simply failed to respond to the e-mail and, thereafter, Interland automatically shut down SmartText's website on Interliant's server and started the website on its own server-at which time SmartText was arguably left with no alternative but to conduct its business on Interland's server as SmartText's customers were automatically directed to the website on the Interland server. In other words, the record reflects that as of January 31, 2002, there was little, if anything, that Smart-

---

4. It appears to the court that there were other facts in the *Caterpillar Tractor* case that distinguish that case from the facts presented here, but the court in *Caterpillar Tractor* does not seem to rely on those facts in reaching its ultimate conclusion.

Text could do to decline or reject Interland's services. In that regard, it is also unclear whether the 5–day deadline unilaterally imposed by Interland was a reasonable period of time for SmartText to reject the offer in light of the alternatives available to it.

Thus, the court concludes that genuine issues of material fact exist concerning whether SmartText had a "reasonable opportunity to reject" Interland's services within the meaning of subsection (1)(a) of section 69 of the Restatement (Second) of Contracts. Similarly, the court concludes that there is a fact issue concerning whether SmartText "[took] the benefit" of Interland's services or whether those services were, in essence, forced upon it after its failure to respond to the e-mail. Finally, there is a factual issue as to whether SmartText, as of January 31, 2002 when Interland asserts the contract was formed, had even used any of Interland's services or received any benefits from those services; it is unclear to the court whether the teneron.com website was functioning properly as of that date and whether SmartText had received any benefit from Interland's hosting of that site as of January 31, 2002.

SmartText also suggests in its papers that it never intended to accept the offer contained in the January 27, 2002 e-mail—an argument that directly implicates subsection (1)(b) of section 69 of the Restatement (Second) of Contracts, another alternative provision of that section. That provision states that an offeree's failure to reply to an offer will operate as an acceptance only "[w]here the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and in active intends to accept the offer." In other words, Interland cannot turn SmartText's silence into acceptance by simply sending an e-mail that says, in essence, "If we don't hear from you within five days, you are deemed to have accepted our services and the terms thereof." *See* Farnsworth, *supra,* § 3.15 at 157 (Offeror cannot impose liability on the offeree that remains silent by adding to the offer the phrase "If I do not hear from you in a week, I will take it that you have accepted my offer."). Rather, when the offeror states in the offer (as Interland did here) that silence will be deemed as acceptance, then the offeree's silence will constitute an acceptance only when the offeree, by his silence, intends to accept the offer. *See* Restatement (Second) of Contracts § 69(1)(b) (1981); *see also id.* § 69 cmt. c ("The mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting.").[5]

The drafters of the Restatement have provided the following illustration of section 69(1)(b):

A offers by mail to sell to B a horse already in B's possession for $250, saying: "I am so sure that you will accept that you need not trouble to write me. Your silence alone will operate as acceptance." B makes no reply, but he does not intend to accept. There is no contract.

*Id.* § 69 cmt. c, illus. 2. By contrast, if the facts remained the same as set forth in the

---

5. While the Kansas courts have not expressly adopted this Restatement provision, the rule as stated by the Kansas Supreme Court in *Caterpillar Tractor* is certainly in substantial accord with the provision. There, the landlord, while remaining silent in the face of the farmer's statement that he would not pay cash rent, evidenced an intent to accept the modification by advising the farmer to continue farming and by failing to require cash rent over the next four or five years.

illustration but B remained silent with the intention of thereby expressing his acceptance, there is a contract. *Id.* § 69 cmt. c, illus. 4. Here, the record submitted by defendant does not bear on the issue of SmartText's intent in failing to respond to the e-mail. A jury trial is thus necessary to resolve this issue.

In sum, because defendant has failed to show the absence of a genuine issue of fact and has failed to demonstrate, as a matter of law, that the parties agreed to arbitrate their claims, a jury trial on this issue is warranted. *See Avedon Engineering, Inc. v. Seatex,* 126 F.3d 1279, 1283 (10th Cir. 1997) (a jury trial on the existence of an agreement to arbitrate is warranted unless there are no genuine issues of material fact regarding the parties' agreement).[6]

*C. Is the Arbitration Clause Broad Enough to Cover SmartText's Claims?*

Assuming that a jury determines that the parties actually had an agreement to arbitrate, the question then becomes whether the arbitration clause is broad enough to include SmartText's claims concerning the migration of the smartagreements.com website.[7] In that regard, SmartText contends that the arbitration clause does not cover disputes concerning the migration of websites and that it applies only to disputes relating to hosting services. SmartText also contends that, to the extent it did agree to the arbitration clause by failing to respond to the January 27, 2002 e-mail and thereafter accepting the benefit of Interland's services, that e-mail (and SmartText's alleged acceptance of the Terms of Service) was directed only to the teneron.com website and the arbitration clause is not broad enough to cover disputes concerning the smartagreements.com website in the absence of a separate agreement to that effect.

■ The scope of an arbitration clause, as a matter of contractual interpretation, is a question of law for the court as long as it does not depend on extrinsic evidence and is susceptible of only one reasonable interpretation. *Zink v. Merrill Lynch Pierce Fenner & Smith, Inc.,* 13 F.3d 330, 332 (10th Cir.1993). The arbitration clause contained in the pertinent Terms of Service provides, in relevant part, that "any dispute between the parties arising out of this Agreement or in any manner relating to the Services must be submitted by the parties to arbitration." The arbitration clause is readily susceptible of an interpretation that includes SmartText's claims concerning the migration of its smartagreements.com website.

■ According to SmartText, the migration of a website does not constitute a "Service" as that term is defined in the

---

6. In reviewing SmartText's brief in response to the motion to compel arbitration, the court has discerned only those arguments addressed in this order. The court, however, believes that other arguments could be made in response to the motion, but those arguments have not been raised by SmartText as the court has construed SmartText's brief. Thus, if SmartText has intended to assert any other argument not addressed in this order, SmartText should file a motion to reconsider the court's order.

7. In its brief, SmartText states that it is asserting no claims and seeking no relief against Interland for any conduct concerning the migration of the teneron.com website and, thus, to the extent the arbitration clause might cover disputes concerning the teneron.com website, the issue is irrelevant to SmartText's claims in any event. While it is true that SmartText's claims of negligence and misrepresentation address only the migration of the smartagreements.com website, SmartText's breach of contract claim and Kansas Consumer Protection Act claim clearly address the migration of both websites. To the extent that SmartText does not intend to assert any claims in connection with the teneron.com website, it should amend its complaint accordingly.

contract and, thus, any dispute concerning the migration of smartagreements.com is not arbitrable. The contract defines "Service" as "either Hosting Service or Optional Service." In turn, "Hosting Service" is defined as providing "specified connectivity, storage space and bandwidth for the hosting of a Customer Web site." "Optional Service" is defined as "any additional service (other than Hosting Service) Interland may provide in response to an Order, as more particularly described in the applicable Service Description." Regardless of whether migration is itself a "Service" as defined in the contract, the arbitration clause here covers not only those disputes concerning hosting services, but also any disputes concerning any issues in any way relating to hosting services. The migration of a website is certainly sufficiently "related to" hosting services such that the arbitration clause (or, more specifically, the portion of the clause that covers disputes "in any manner relating to the Services") would cover disputes concerning migration. *See Brown v. Coleman Co.*, 220 F.3d 1180, 1184 (10th Cir.2000) (when a contract contains a broad arbitration provision, any matters that touch the subject that is to be arbitrated should be arbitrated as well); *accord P & P Indus., Inc. v. Sutter Corp.*, 179 F.3d 861, 871 (10th Cir.1999) (if the allegations in the complaint touch matters covered by the arbitration clause, then those claims must be arbitrated).

Indeed, Interland would be wholly unable to provide hosting services to SmartText without first migrating SmartText's websites to its server. Without question, then, the concepts of migration and hosting are closely related. Thus, any disputes concerning migration fall within the scope of the arbitration provision.

SmartText also asserts that the arbitration clause does not cover any disputes concerning the smartagreements.com website because SmartText, to the extent it accepted the Terms of Service at all, did so only in connection with the teneron.com website. In a related vein, SmartText contends that its acceptance of the Terms of Service in connection with the January 27, 2002 e-mail concerning teneron.com could not possibly pertain to smartagreements.com because, at the time of the January 27, 2002 e-mail, the process of migrating of smartagreements.com had not even commenced. According to Smart-Text, then, any disputes concerning the smartagreements.com website would fall outside the scope of any agreement it may have entered with Interland concerning teneron.com.[8]

The broad language of the arbitration clause in the Terms of Service, however, does not support SmartText's contention. For even assuming that the "Agreement" as that term is used in the arbitration clause refers only to the contract for the provision of services with respect to teneron.com,[9] the arbitration clause nonetheless

---

**8.** SmartText suggests in its brief that Interland, in essence, concedes that the January 27, 2002 e-mail and corresponding Terms of Service pertained only to teneron.com and not to smartagreements.com because in April 2002 Interland sent SmartText another e-mail with respect to the migration of smartagreements.com and that e-mail again requested SmartText's acceptance of the Terms of Service. According to SmartText, then, this second e-mail concerning smartagreements.com was wholly unnecessary if the January e-mail and corresponding Terms of Service was suf-

ficient to cover both teneron.com and smartagreements.com. SmartText, however, does not direct the court to any authority (and the court is aware of none) suggesting that Interland's act of sending a second e-mail in any way changes the scope of the arbitration clause contained in the Terms of Service.

**9.** "Agreement" is defined in the Terms of Service as "each contract created between Interland and Customer for the provision of Services consisting of an Order, the applica-

covers those disputes "in any manner relating to the Services" provided by Interland to SmartText. This phrase is clearly susceptible of an interpretation that covers any disputes concerning the smartagreements.com website. As explained above, the migration of the teneron.com website was related to the hosting of the teneron.com website. Similarly, the migration of the smartagreements.com website was related to the hosting of the teneron.com website. Although SmartText in its brief characterizes the two websites as "separate and distinct," SmartText's complaint reveals that the websites were closely related and that the usefulness of the smartagreements.com website depended at least in part on whether the teneron.com website was functioning properly. In that regard, SmartText alleges in its complaint that its customers frequently accessed the smartagreements.com website through teneron.com, a portal website, such that if the teneron.com website was not functioning, then SmartText's customers could not access smartagreements.com through the teneron.com site. These allegations, then, demonstrate that the successful migration and hosting of the teneron.com website was certainly tied, to some extent, to the successful migration and hosting of the smartagreements.com website. For this reason, the court concludes that the migration of the smartagreements.com website is sufficiently "related to" services provided by Interland to SmartText to require arbitration of disputes concerning the smartagreements.com website.

■ The court's rejection of SmartText's reading of the arbitration clause is further reinforced by the "strong federal policy favoring arbitration for dispute resolution." *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1514 (10th Cir. 1995) (quotation omitted). While a party may not be compelled to submit a dispute

to arbitration unless it has agreed to do so, federal arbitration policy requires that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *see also AT & T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648–50, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (arbitration agreements are favored and are to be broadly construed with doubts being resolved in favor of coverage). Thus, arbitration should be compelled "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). The arbitration clause in Interland's Terms of Service is certainly susceptible of an interpretation that covers all of SmartText's claims.

Accordingly, assuming that a jury concludes that the parties agreed to the arbitration clause, then all of the claims, controversies, and disputes between SmartText and Interland are arbitrable under the arbitration clause contained in Interland's Terms of Service.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion to dismiss plaintiff's complaint and compel arbitration or, in the alternative, to transfer the case to the United States District Court for the Northern District of Georgia (doc. # 3) is **retained under advisement** until such time as a jury resolves the issue of whether an agreement to arbitrate was made. In that regard, the court will conduct a status conference via telephone with counsel for SmartText and counsel for Interland on **December 29, 2003 at 10:30 a.m.** to discuss further scheduling in this

ble Service Description and these Terms of Service."

case. Counsel are directed to contact Sharon Scheurer, courtroom deputy for Judge Lungstrum, prior to December 29, 2003 to provide her with a telephone number at which they can be reached on December 29, 2003.

**IT IS SO ORDERED.**