In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 23-2672

PILAR DOMER,

*Plaintiff-Appellant,*

*v.*

MENARD, INC.,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 3:22-cv-00444-jdp — **James D. Peterson**, *Chief Judge.*

---

ARGUED JANUARY 25, 2024 — DECIDED SEPTEMBER 3, 2024

---

Before HAMILTON, BRENNAN, and KIRSCH, *Circuit Judges.*

BRENNAN, *Circuit Judge.* Pilar Domer submitted an online order to pick up a can of paint at a Menards home improvement store. Menards charged Domer a $1.40 fee for the pickup service she selected. Domer commenced this putative class action, alleging that Menards had not disclosed the pickup service fee and used the fee to manipulate its prices. Menards

moved to compel arbitration of Domer's claims. The district court granted Menards's motion, finding that the parties had entered into an arbitration agreement and that Domer's claims fell within its scope.

Domer appealed, arguing that the arbitration agreement was invalid and unenforceable, and in any event did not cover her claims. We affirm the district court. Menards has shown that its website provided reasonably conspicuous notice of the terms to which Domer would be bound and Domer unambiguously manifested her assent to those terms. Additionally, each of Domer's claims arise from or relate to the contract between Domer and Menards. So, Domer's claims are within the scope of the arbitration agreement.

**I**

Menard, Inc. is a home improvement retail company that sells goods through brick-and-mortar stores and on its website.[1] Customers who purchase products online have three options for receiving their goods. They may go to a local store and locate the item on the shelf, pay a small fee to have a Menards employee locate the item on the shelf and prepare it for pickup, or have the product shipped to their home.

Domer visited the Menards website to purchase a can of paint. Before checking out, she chose option three on the website: to have an employee retrieve the correct item from the shelf, prepare it for pickup at the Menards store in Valparaiso, Indiana, and place it at the pickup counter. In exchange for that service, Menards would charge her a $1.40 per item fee.

---

[1] Menards is owned by the defendant Menard, Inc. For clarity this opinion uses "Menards" throughout, as did the district court.

After Domer selected the pickup option, the website presented her with the final page in the online checkout process:



As shown, the page presented a summary of Domer's transaction. It included one shaded, bordered box listing her "Billing & Credit Card Information" and an adjoining column with her "Order Summary." The "Billing & Credit Card Information" listed her payment information. The box also presented options to receive text updates on the status of her order and to use a gift card. The "Order Summary" column listed four line-items: the "Merchandise Subtotal" (the price of the items purchased); the "Processing Fees" (the pickup service fee); the "Sales Tax"; and the "Total" cost. In addition, the "Order Summary" column included a sentence explaining how much money Domer had saved on her purchase, the option to submit her purchase, and a couple of sentences advertising the Menards credit card.

The same page included an additional note to purchasers immediately below the "Billing & Credit Card Information" section:

> **Please note**: Gift cards may be used as a tender for any merchandise portion of your order and cannot be applied to purchase of another gift card. Applied gift card tenders will be used first towards your purchase and the remaining balance applied to your entered credit card. By submitting your order you accept our Terms of Order.

The note began with bold font and used the same size and style font as the surrounding text.

Directly below the note, there were two hyperlinks: "View Return Policy | Terms of Order Information." The links, like the note, used the same size font as the surrounding text. But the links were green, unlike the black font of the surrounding text. Clicking on the "Terms of Order Information" link opened a text box with the Menards Terms of Order. The first paragraph of the Terms of Order contained an arbitration clause:

> **READ THIS CONTRACT CAREFULLY**. … Purchaser agrees that any and all controversies or claims arising out of or relating to this contract, or the breach thereof, shall be settled by binding arbitration administered by the American Arbitration Association under its applicable Consumer or Commercial Arbitration Rules. Purchaser agrees that all arbitrators selected shall be attorneys. This

> provision shall supersede any contrary rule or provision of the forum state. YOUR PURCHASE OF THE PRODUCT ON THIS CONTRACT CONSTITUTES YOUR AGREEMENT TO ALL TERMS AND CONDITIONS STATED ABOVE.

The text box for the Terms of Order used a larger font than the surrounding text.

Domer completed her purchase and picked up her can of paint in the designated store. Domer then commenced this putative class action.[2] Domer's amended complaint included three claims: (1) violation of the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-4; (2) violation of the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18; and (3) unjust enrichment, *see Sands v. Menard*, 904 N.W.2d 789, 798 (Wis. 2017) (describing the elements of Wisconsin's unjust enrichment law). She alleged that Menards had used the pickup service fee to manipulate its prices—artificially deflating them by $1.40 in its advertising materials and then recouping that difference in the form of an undisclosed fee. Additionally, she argued that the $1.40 processing fee for in-store pickup had not been disclosed, and, had it been disclosed, she would not have purchased the can of paint.

---

[2] The district court had jurisdiction under the Class Action Fairness Act of 2005 (codified at 28 U.S.C. § 1332(d)). Domer is a citizen of Indiana. Menard, Inc. is incorporated and maintains its principal business offices in Wisconsin. Menards also regularly conducts business and operates store locations in Indiana. There are more than one hundred members in the putative class and the amount in controversy is greater than $5,000,000. We have jurisdiction over the appeal of the district court's final judgment pursuant to 28 U.S.C. § 1291.

Menards moved to compel arbitration under the Federal Arbitration Act, 9 U.S.C. §§ 3, 4. To Menards, Domer entered into an enforceable arbitration agreement by accepting the Menards Terms of Order when she completed her online purchase. As a result, the parties had a valid and binding agreement requiring arbitration of any disputes that either arise from or relate to Domer's online purchase. Menards further contended that Domer's claims fall within the scope of the arbitration agreement and, therefore, must be arbitrated.

The district court ruled for Menards. The court found that the arbitration agreement was enforceable. The totality of the circumstances demonstrated fair and adequate notice of the existence of an agreement and the consequence of proceeding with an online purchase. The court also found that "[a]ll of Domer's claims are related to her contract of purchase with Menards: Domer agreed to pay Menards money, and Menards provided her with a can of paint in exchange." So, her claims fell within the scope of the "expansive" arbitration clause to which she had agreed.

## II

On appeal, Domer argues that the district court erroneously granted Menards's motion to compel arbitration. To her, the arbitration agreement was invalid and unenforceable, and in any event did not cover her claims.

The "[a]rbitrability of a dispute is often a question of law that does not depend on undisputed facts… ." *Scheurer v. Fromm Fam. Foods LLC*, 863 F.3d 748, 751 (7th Cir. 2017) (citing 21 WILLISTON ON CONTRACTS § 57:68 (4th ed. 2017)). Sometimes, though, it "present[s] a mixed question of law and fact." *Id.* We review a district court's ruling on a motion to

compel arbitration based on the procedural posture of that ruling. *Id.*

When a factual dispute exists about whether an arbitration agreement was made, parties have options. If the question is brought to a jury, we "must uphold the finding if it is supported by a reasonable basis in the record." *Id.* This includes evidence or expert testimony. Additionally, if the judge holds an evidentiary hearing, we review findings of fact "for clear error." *Id.* The parties here chose neither of these possibilities. Domer has conceded that here "the facts are undisputed."[3]

In cases with no factual disputes, the district court decides the issue as a matter of law. In these instances, like here, our "review should be de novo." *Id.; see Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1033 (7th Cir. 2012) ("We review de novo a district court's grant or denial of a motion to compel arbitration.").

**A. Formation of the Arbitration Agreement**

Whether an agreement to arbitrate has been formed is governed by state-law principles of contract formation. *Gore*, 666 F.3d at 1032. Wisconsin contract law applies here. *Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 702 (7th Cir. 2022) (citing *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 283 (7th Cir. 2002)). But, as the district court stated, this case "calls for the application of general rules of contract formation, so the choice of law is not likely to affect the outcome." Menards bears the burden of proving that an agreement to arbitrate exists. *See A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1063 (7th Cir. 2018).

---

[3] Oral Argument, 5:30–5:40.

The Menards Terms of Order contains an arbitration clause. Domer contends she did not agree to these terms, and therefore did not agree to arbitrate her claims, when she submitted her purchase order on the Menards website.

Under Wisconsin law, the formation of a valid contract requires that "an offer was accepted." *Wells Fargo Bus. Credit v. Hindman*, 734 F.3d 657, 667 (7th Cir. 2013) (quoting *Hoeft v. U.S. Fire Ins. Co.*, 450 N.W.2d 459, 463 (Wis. Ct. App. 1989)). Additionally, there must "be a meeting of the minds, a factual condition that can be demonstrated by word or deed." *Id.* (quoting *Zeige Distrib. Co. v. All Kitchens, Inc.*, 63 F.3d 609, 612 (7th Cir. 1995). "Objective manifestations of assent, rather than subjective intentions, are controlling." *Id.* (citing *Associated Milk Producers, Inc. v. Meadow Gold Dairies, Inc.*, 27 F.3d 268, 272 (7th Cir. 1994); *see also Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814 (7th Cir. 1987). Intent to manifest assent is generally "'derived from a consideration of th[e parties'] words, written and oral, and their actions.'" *Skyrise Constr. Grp., LLC v. Annex Constr., LLC*, 956 F.3d 950, 956 (7th Cir. 2020) (quoting *Household Utils., Inc. v. Andrews Co.*, 236 N.W.2d 663, 669 (Wis. 1976)). But the parties are not required to have signed the agreement for it to be valid. *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 736 (7th Cir. 2002). Arbitration is "a creature of contract." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033 (7th Cir. 2016) (citing *inter alia AT&T Mobility LLC. v. Concepcion*, 563 U.S. 333, 339 (2011)). So, these principles apply with equal force to arbitration contracts, including those purportedly formed over the internet.

One way to assent to and form a contract online is for a customer to click on an "I Accept" button as part of a "click-wrap" agreement. *See id.* "Courts around the country have

recognized that this type of electronic 'click' can suffice to signify the acceptance of a contract." *Id.* These agreements differ from "browsewrap" agreements, which provide veiled notice to customers that mere use of the website constitutes agreement to various terms and conditions. *See Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 513 (9th Cir. 2023) (comparing clickwrap and browsewrap agreements in the context of online arbitration agreements). Browsewrap agreements typically are not enforced. *Id.*

But, as here, online agreements often fall somewhere in between these two forms of agreement. Courts acknowledge that some companies "rely on simply displaying," somewhere on a webpage, "a notice of deemed acquiescence and a link" to the putative terms. *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 62 (1st Cir. 2018). When this happens, "purported assent is largely passive." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 120 (2d Cir. 2012). And when assent is passive, a court will recognize an enforceable contract "only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (citing *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017)).

Although these questions may involve underlying facts, they are questions of law. Rather than resolving questions of fact, we undertake a fact-intensive legal analysis. *See Sgouros*, 817 F.3d at 1034–35. While this "may lead to different results as courts encounter novel fact patterns, the general legal framework remains unchanged." *Oberstein*, 60 F.4th at 515.

Domer did not click a button saying "I Accept" to form the arbitration agreement. So, to prove that the arbitration agreement was formed, Menards must satisfy the test for when assent is passive. Although we analyze the website checkout page presentation, we do so to decide two legal questions: (1) did the website provide reasonably conspicuous notice of the terms to which the consumer will be bound, and (2) did the consumer take some action that unambiguously manifested his or her assent to those terms? *See Berman*, 30 F.4th at 856.

### 1. *Reasonably conspicuous notice*

We examine notice from the perspective of a reasonable online shopper—that is, a person who is neither an expert nor a novice with technology. *See Meyer*, 868 F.3d at 77 ("Accordingly, when considering the perspective of a reasonable smartphone user, we need not presume that the user has never before encountered an app or entered into a contract using a smartphone."). This permits certain basic, objective assumptions regarding the user's familiarity with commercial websites, hyperlinks, and online contracts, regardless of subjective experience.

When deciding whether an online disclosure has afforded fair notice, we consider five elements: (1) the simplicity of the screen; (2) the clarity of the disclosure; (3) the size and coloring of the disclosure's font; (4) the spatial placement of the hyperlink; and (5) the temporal relationship to the user's action. *See, e.g., id.* at 78–79. No single factor is dispositive: the question is whether the website provided reasonable notice "in light of the whole webpage." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 237 (2d Cir. 2016).

*Simplicity of the screen.* First, we assess the simplicity of the information on the screen and the way that information is presented. *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017) ("The Payment Screen is uncluttered, with only fields for [(1)] the user to enter his or her credit card details, [(2)] buttons to register for a user account or to connect the user's pre-existing PayPal account or Google Wallet to the Uber account, and [(3)] the warning that 'By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY.'"). The district court concluded that Menards online checkout page was "relatively uncluttered."

Menards online checkout page includes fields for (1) the user to enter his credit card details, (2) an order summary listing costs with a button to submit the order, (3) an option to receive text updates on the status of the order, (4) a note about the use of gift cards and explaining that "By submitting your order you accept our Terms of Order," (5) hyperlinks to the Terms of Order Information and Return Policy, and (6) a note explaining that the shopper could save money with a Menards credit card. The only non-standard item in this list is the Menards credit card note.

Domer argues the Menards webpage is "sufficiently distracting so as to divert users' attention from the disclosure and consequences of placing an order." She compares the checkout page to the interface in *Nicosia*. 834 F.3d at 240–41. The court in *Nicosia* found the webpage may not have been clear because of the company's use of many different fonts ("various text is displayed in at least four font sizes and six colors (blue, yellow, green, red, orange, and black)"); the presence of numerous extraneous elements ("multiple buttons and promotional advertisements"); the spatially dissipated, complex

presentation of various categories of transaction-related information ("customers' personal address, credit card information, shipping options, and purchase summary"); and the sheer number of hyperlinks on the page ("between fifteen and twenty-five links"). *Id.* at 236–38. But the court "d[id] not hold that there was no objective manifestation of mutual assent here as a matter of law." *Id.* at 238. Rather, it concluded "simply that reasonable minds could disagree on the reasonableness of notice." *Id.* (holding that the district court erred in concluding that Nicosia failed to state a claim under Federal Rule of Civil Procedure 12(b)(6)).

In contrast, the Menards page is streamlined, well-spaced, and internally consistent. There is ample white space; nearly all the text and images on the screen are pertinent to the checkout process; and the page is organized into just a few neat boxes and columns (*see* "Billing & Credit Card Information" and "Order Summary"). And the page is not littered with dozens (or even a handful) of hyperlinks. The page has a consistent color and typeface, and only a few items are presented in bold type. So, those items—including the disclosure of the Terms of Order—are likely to catch a user's attention. The district court correctly found that the Terms of Order were reasonably conspicuous in this uncluttered presentation.

*Clarity of the disclosure.* Where, as here, "terms are not displayed" directly to a user, but instead "must be brought up by using a hyperlink," a "clear prompt directing the user to read them" is required. *Sgouros*, 817 F.3d at 1035. That usually means a statement prominently offset from other text—one that is "bold, capitalized, or conspicuous in light of the whole webpage." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 290 (2d Cir.

2019). While it is permissible to disclose terms and conditions through a hyperlink, "the fact that a hyperlink is present must be readily apparent." *Berman*, 30 F.4th at 857. A web designer must do more than "simply underscore the hyperlinked text" to ensure that it is sufficiently "'set apart'" from the surrounding text. *Id.* (citing *Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 29 (2021)). Customary design elements denoting the existence of a hyperlink include "the use of a contrasting font color (typically blue) and the use of all capital letters." *Id.*

The Menards disclosure provides such a prompt for the consumer. It explicitly tells the user: "**Please note**: … By submitting your order you accept our Terms of Order." Courts have compelled arbitration based on similar prompts. *See, e.g.*, *Meyer*, 868 F.3d at 78–79 (language stating "[b]y creating an Uber account, you agree" was "a clear prompt directing users to read the Terms and Conditions and signaling that their acceptance of the benefit of registration would be subject to contractual terms" (quotations omitted)); *Selden v. Airbnb, Inc.*, 4 F.4th 148, 157 (D.C. Cir. 2021) ("The screen provided reasonable notice to Selden that, by signing up, he was agreeing to Airbnb's Terms of Service.").

Domer relies on *Sgouros* to argue that the Menards "**Please note**" disclaimer was not conspicuous enough. But in *Sgouros*, the bold text beneath the scroll box informed the purchaser that clicking on the box constituted his authorization for the company to obtain his personal information—it said "nothing about contractual terms." *Sgouros*, 817 F.3d at 1035 (explaining the web pages "contained no clear statement that his purchase was subject to *any* terms and conditions of sale). So, the court held that the company "actively misle[d]" the customer. *Id.* "No reasonable person" would have thought that

authorizing a company to retrieve personal information would form a contract binding him to arbitration. *Id.* The Menards checkout page is different: the prompt advises users that by completing a purchase they are agreeing to the Terms of Order, which included the arbitration agreement.

On the Menards website, the prompt and the disclosure are separated by two sentences about gift cards, but they constitute only one line of text. This does not render the prompt inconspicuous or misleading. As the district court correctly observed, the bold font stating "**Please note**" "encourage[s] a reasonable user to read through to the end of the notice." That Domer did not read the gift card sentences is not relevant. What matters here is that a reasonable internet user would have seen the bold font stating "**Please note**" against the clean, white background and would have been on notice to read the two lines of text following the prompt. *See Meyer*, 868 F.3d at 79 ("While it may be the case that many users will not bother reading the additional terms, that is the choice the user makes; the user is still on inquiry notice."). This factor also weighs in favor of the finding that the Terms of Order were reasonably conspicuous.

*Design of the hyperlinks and disclosure.* The hyperlinks to the Terms of Order are offset from the white background in a bright, green color, which, as the district court observed, contrasts with the black text of the disclosure immediately above it. *See Meyer*, 868 F.3d at 78 (disclosure was conspicuous in part because "the dark print contrasts with the bright white background").

It does not matter that the text was green rather than the "typical[] blue." *Berman*, 30 F.4th at 857; *see, e.g.*, *Selden*, 4 F.4th at 157 (a reasonable online shopper was on notice of terms

appearing in red, hyperlinked text against a white background). "Reasonable notice does not turn on where the hyperlinked text falls on the color wheel… ." *Selden*, 4 F.4th at 157. Further, the text of the links themselves directs shoppers to "[v]iew" the Return Policy and Terms of Order Information, which is an indication that the terms are links and not static text. Domer claims the text of the disclosure above the hyperlinks was impermissibly small. Yet the font was the same as much of the surrounding text, and more is not required. *See Scribner v. Trans Union LLC*, __ F. Supp. 3d ___, ___(E.D. Cal. July 2, 2024), 2024 WL 3274838 at *5 (considering that the hyperlink to the Terms of Use Agreement was "the same size as the surrounding text," the court found that the website "provided reasonably conspicuous notice"); *cf. Berman*, 30 F.4th at 856–57 (finding the notice not reasonably conspicuous where the notice was "printed in a tiny gray font considerably smaller than the font used in the surrounding website elements, and indeed in a font so small that it is barely legible to the naked eye"); *Starke*, 913 F.3d at 293 (finding the notice not reasonably conspicuous where the Terms & Conditions hyperlink was "some of the smallest text").

The disclosure begins with the bolded "**Please note**", drawing the customer's attention. It is placed alone below the "Billing & Credit Card Information," where a customer is likely to see it. That Menards chose to place the hyperlinks below instead of within the disclosure does not increase the likelihood that a customer would overlook them. Rather, having the words "Terms of Order" listed twice, once in the disclosure and once in the hyperlink, makes it more likely the customer sees them.

The district court correctly found that the font of the disclosure and hyperlinks are readable and distinct from the surrounding text. So, this element weighs in favor of affirming the district court's finding of fair notice.

*Spatial placement of the disclosure.* Text advising users of terms should be spatially coupled with the act deemed to manifest assent to those terms. *See Starke*, 913 F.3d at 292 ("The text, including the hyperlinks to the Terms and Conditions and Privacy Policy, appeared directly below, i.e., was spatially coupled with the registration button." (cleaned up)). Domer argues that because the "By submitting your order" disclosure is not spatially closer to the "SUBMIT ORDER" button on the webpage, she did not have reasonable notice to assent to the agreement. The district court found that "[t]he distance between the [disclosure] and the purchase button does not render Menards' disclosure unreasonable."

Domer correctly contends that the page lists the disclosure near the bottom with language discussing gift card use. But the disclosure and hyperlinks are placed directly below the "Billing & Credit Card Information" box, which a reasonable shopper undoubtedly reviews, and they are part of the natural visual flow of reviewing the page. *See Schnabel*, 697 F.3d at 127 ("[T]he presentation of these terms at a place and time that the consumer will associate with the initial purchase or enrollment, or the use of, the goods or services from which the recipient benefits at least indicates to the consumer that he or she is taking such goods or employing such services subject to additional terms and conditions that may one day affect him or her."). The user can see the disclosure and click the hyperlink while viewing the rest of the checkout information and does not need to scroll far, if at all, to read them. *See*

*Meyer*, 868 F.3d at 78 (finding the notice reasonable where the "entire screen is visible at once, and the user does not need to scroll beyond what is immediately visible to find notice of the Terms of Service."). The bold "**Please note**" draws the user's eye to the information, and the disclosure and hyperlink are very close together with the hyperlink appearing directly below the disclosure. It is enough that the disclosure and hyperlinks are "clearly visible when viewing the page." *Fagerstrom v. Amazon.com, Inc.*, 141 F. Supp. 3d 1051, 1069 (S.D. Cal. 2015), *aff'd sub nom*. *Wiseley v. Amazon.com, Inc.*, 709 F. App'x 862 (9th Cir. 2017) (observing that notices likewise do not need to "dominate the entire checkout page display").

Again, the cases Domer relies on are distinguishable. In *Wilson*, the company's notice was in small, unbolded text, and it was placed underneath large, colorful buttons. *See Wilson v. Redbox Automated Retail, LLC*, 448 F. Supp. 3d 873, 879 (N.D. Ill. 2020) (attaching an image of the online notice). Those buttons were "entirely unrelated" to the transaction at hand. *Id.* at 884. Additionally, in *Starke* the "'Terms & Conditions' hyperlink was spatially decoupled from the transaction because it was not provided near the portion of the Amazon purchase page actually requiring Starke's attention … or indeed anywhere on the purchase page." *Starke*, 913 F.3d at 294. The Menards notice, on the other hand, is flagged with bolded text, a similar size to other text on the screen, and placed next to credit card and shipping information that a user is likely to review prior to submitting their order.

So, the notice and disclosure are not, as Domer suggests, "hidden" away. And this element weighs in favor of affirming the district court's finding of a reasonably conspicuous notice.

*Temporal relationship.* The disclosure is temporally connected to the required act of the user—in other words, the user encounters the disclosure on the same page where the order will be placed. *See Meyer*, 868 F.3d at 79 ("temporal coupling of the terms with the registration button" weighs in favor of "inquiry notice of the terms"); *Schnabel*, 697 F.3d at 127 (explaining that the temporal presentation of the consumer's purchase suggests that receiving goods subjects that consumer to additional terms and conditions). This leaves no discrepancy between the necessary act (clicking the "SUBMIT ORDER" button) and the disclosure requiring assent. The "notice of the Terms of Service is provided simultaneously" to submission of the purchase, "connecting the contractual terms to the services to which they apply." *Meyer*, 868 F.3d at 78. As a result, it is easy for the user to connect the disclosure with the required activity. So, this element weighs in favor of affirming the district court's finding of fair notice.

To summarize on this first prong of whether an agreement was made when assent is passive, the Menards checkout page is not a visually bewildering screen. As the district court found, the website provided reasonably conspicuous notice of the terms to which the consumer, Domer, will be bound.

### 2. *Assent to the Terms of Order*

On the second prong, Domer argues that because the checkout webpage did not reasonably communicate the existence of the Terms of Order, she did not unambiguously assent. *See Cullinane*, 893 F.3d at 64 ("Because the Plaintiffs were not reasonably notified of the terms of the Agreement, they did not provide their unambiguous assent to those terms."). According to Domer, a reasonably prudent internet user in her position had no reason to understand that, by clicking the

"SUBMIT ORDER" button, the user was unambiguously manifesting assent to terms Menards had proposed elsewhere on the checkout webpage.

Domer is incorrect. "There is nothing automatically offensive about such agreements, as long as the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement." *Sgouros*, 817 F.3d at 1033–34. As explained above, the Menards notice was reasonably conspicuous, so Domer manifested her assent to accept the Terms of Order by going through with the purchase. Unlike with pure clickwrap agreements, clicking "SUBMIT ORDER" "does not specifically manifest assent to the additional [arbitration] terms, for the purchaser is not specifically asked whether she agrees or to say 'I agree.'" *Nicosia*, 834 F.3d at 236–37.

Nevertheless, Domer unambiguously gave her assent to the arbitration provision. Although Domer's assent "was not express, we are convinced that it was unambiguous in light of the objectively reasonable notice of the terms, as discussed in detail above." *Meyer*, 868 F.3d at 79; *see Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004) ("[R]egardless whether [a user] did or did not say, 'I agree' … [the user's] choice was either to accept the offer of contract, taking the information subject to the terms of the offer, or, if the terms were not acceptable, to decline to take the benefits.").

As described above:

> There is ample evidence that a reasonable user would be on inquiry notice of the terms, and the spatial and temporal coupling of the terms with the registration button indicated to the

> consumer that he or she is … employing such
> services subject to additional terms and condi-
> tions that may one day affect him or her. … A
> reasonable user would know that by clicking
> the registration button, he was agreeing to the
> terms and conditions accessible via the hyper-
> link, whether he clicked on the hyperlink or not.

*Meyer*, 868 F.3d at 79–80 (citation and quotations omitted). Reasonable consumers understand there will be terms and conditions associated with using a website. That clicking the register button had two functions—purchase of an order and assent to the Terms of Service—does not render Domer's assent ambiguous. *See id.* at 80. So, clicking the "SUBMIT ORDER" button demonstrated Domer's unambiguous manifestation of assent to the arbitration agreement.

*       *       *

Menards has shown that (1) its website provided reasonably conspicuous notice of the terms to which Domer would be bound, and (2) Domer's click of the button "SUBMIT ORDER" unambiguously manifested her assent to those terms. *See Berman*, 30 F.4th at 856. So, the arbitration agreement was formed when Domer submitted her order.

### B. Scope of the Arbitration Agreement

Once the parties "have a contract that provides for arbitration of some issues between them, any doubt concerning the scope of the arbitration clause is resolved in favor of arbitration as a matter of federal law." *Gore*, 666 F.3d at 1032.

After concluding that Menards and Domer had formed a valid arbitration contract, the district court found that Domer's claims all arise from or relate to her contract of

purchase with Menards. So, Domer's claims fall within the scope of the arbitration agreement.

Domer claims this court has no binding precedent for cases like this one where "the conduct underlying the claims occurred prior to the formation of the purchase contract." And she asks this court to "clarify" its existing case law and adopt a bright-line rule that claims like hers are categorically beyond the scope of even the most broadly worded arbitration clauses.

Domer is correct that this court has not expressly ruled that claims arising from action taken prior to the formation of an arbitration agreement are within the scope of the agreement. But such a ruling is not required. We have explained that claims may be arbitrated when they fall "within the scope of the agreement" to arbitrate. *Rock Hemp Corp.* 51 F.4th at 702. A claim arises from a purchase agreement when it "draws its very essence from the fact of and performance under the [agreement] in question." *S+L+H S.p.A. v. Miller-St. Nazianz, Inc.*, 988 F.2d 1518, 1524 (7th Cir. 1993). The "arising out of or relating to" language is an "expansive" clause. *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909 (7th Cir. 1999); *see Welborn Clinic v. MedQuist, Inc.*, 301 F.3d 634, 639 (7th Cir. 2002). And the Supreme Court has emphasized that courts must "enforce covered arbitration agreements according to their terms." *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 178 (2019); *Smith v. Bd. of Dirs. of Triad Mfg., Inc.*, 13 F.4th 613, 619–20 (7th Cir. 2021). Courts may not imply limitations or engraft additional terms that the parties did not include in their agreement. *See Lamps*, 587 U.S. at 178.

The Menards Terms of Order represents a valid, binding agreement to arbitrate and is framed in broad terms that state, in part:

> Purchaser agrees that any and all controversies or claims arising out of or relating to this contract, or the breach thereof, shall be settled by binding arbitration … .

Each of Domer's claims "arises out of" or "relates to" her contract with Menards. We see this in her theory of liability and in the injuries she claims. As the district court explained, "[t]he theory behind her consumer protection and unjust enrichment claims is that Menards misled her about the price that she would pay for that purchase." A party "may not avoid a contractual arbitration clause merely by 'casting its complaint in tort.'" *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639, 643 (7th Cir. 1993) (quoting *Altshul Stern & Co. v. Mitsui Bussan Kaisha, Ltd.*, 385 F.2d 158, 159 (2d Cir. 1967)). Per the district court, Domer's claims "could easily be recast as breach of contract claims based on an alleged misrepresentation of the terms of the purchase." And Domer cannot avoid arbitrating her remaining claims merely because she brought them under different causes of action. *See Kroll v. Doctor's Assocs.*, 3 F.3d 1167, 1170 (7th Cir. 1993) (about tort claims); *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987) (about statutory claims). Domer's claims therefore arise out of and relate to the arbitration contract.

Additionally, the only harms Domer alleges are rooted in, and related to, the arbitration contract.[4] Domer disagrees, arguing that her claims are not related to the contract. According to Domer, she "rel[ies] solely on the allegation that Menards induced and enticed customers to patronize its website through false representations regarding the price of items listed on its website." This "occurred prior to and independently from the terms of the contract containing the arbitration provision."

Domer believes this temporal argument differentiates her case from cases like *Sweet Dreams* and *Kiefer*. *Sweet Dreams*, 1 F.3d at 640 (plaintiff alleged the defendant had "fraudulently induced it to continue making expenditures … after the Agreement had expired"); *Kiefer*, 174 F.3d at 908 (conduct alleged to be unlawful occurred "[d]uring the performance of the … agreement"). But Domer's claims rest on the contention that Menards charged her too much for her purchase—a fact that necessarily arose at or after contract formation.

Domer also argues that none of her claims require her to "reference [] the terms of the purchase contract" and are therefore not "encompassed by the scope of the arbitration provision." But under IND. CODE § 24-5-0.5-4:

> A person relying upon an uncured or incurable deceptive act may bring an action for the *damages actually suffered* as a consumer as a result of

---

[4] *See* Domer's Amended Class Action Complaint, at ¶¶ 48, 52 (citing $1.40 processing fee as an expenditure she would have avoided but-for the alleged price deception); *id.* at ¶ 52 (same for the purchase itself); *id.* at ¶ 63 (describing the claimed pecuniary losses); *id.* at ¶¶ 60, 63 (alleging that the unjust enrichment conferred on Menards is the $1.40 fee).

the deceptive act or five hundred dollars ($500), whichever is greater.

IND. CODE § 24-5-0.5-4 (emphasis added); *see Castagna v. Newmar Corp.*, 340 F. Supp. 3d 728, 740 (N.D. Ind. 2018).

Similarly, the elements of a private action under WIS. STAT. § 100.18 are: (1) the defendant advertised the product; (2) the advertising was misleading; and (3) the plaintiff *suffered pecuniary loss* because of the misleading advertising. *See* WIS. STAT. § 100.18; *Tietsworth v. Harley-Davidson, Inc.*, 661 N.W.2d 450, 454–55 (Wis. 2003).

Further, Wisconsin's unjust enrichment law requires proof of:

> (1) a *benefit conferred on the defendant* by the plaintiff; (2) appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention of the benefit by the defendant under circumstances making it inequitable to do so.

*Sands*, 904 N.W.2d at 798 (emphasis added).

As shown in the emphasized language above, each of these claims require an injury to Domer: (1) "damage actually suffered," (2) "suffered pecuniary loss," or (3) "benefit conferred on [Menards]." IND. CODE § 24-5-0.5-4; WIS. STAT. § 100.18; *Sands*, 904 N.W.2d at 798. Whether Domer was misled to "patronize" Menards before the contract was formed does not matter. Domer did not suffer an injury necessary to bring a claim until the contract was formed. In other words, Domer did not suffer real damages, a pecuniary loss, or confer a benefit until the completion of the contract, not prior to it. Without the contract there would be no claims; the contract is an indispensable element of each.

Even if the conduct had occurred before formation of the arbitration agreement, the Supreme Court and Seventh Circuit have compelled arbitration in those instances. *See, e.g.,* *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 398–99, 406 (1967) (an agreement to arbitrate claims "arising out of or relating to" the agreement encompasses claims of fraudulent misrepresentation and inducement occurring prior to agreement); *Gore*, 666 F.3d at 1036 (compelling arbitration of all plaintiff's claims because they were "inextricably linked to the services he received" and the arbitration clause in the second agreement expressly covered the services); *Welborn*, 301 F.3d at 636, 639–40 (compelling arbitration of claims based on conduct that preceded the parties' contract because they constituted disputes over invoice amounts which was covered by the agreement).

Domer cites to authority that is non-binding and distinguishable. Her alleged injuries would not have existed without the one contract that included the arbitration agreement. *Cf. Matalka v. Home Point Fin. Corp.*, 753 F. App'x 372, 376–77 (6th Cir. 2018) (ruling that contract containing arbitration provision did not apply because they were two separate contracts with distinct scopes); *Dr. Kenneth Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 141 F.3d 243, 252 (5th Cir. 1998) (ruling that the plaintiff would have "suffer[ed] the same injuries regardless of the agreement or a breach thereof.").

In the alternative, Domer suggests this court adopt a standard she believes the Fifth and Sixth Circuits use to determine whether an arbitration provision encompasses a claim. According to Domer, those circuits ask whether a claim can be maintained without reference to the agreement at issue. So, she argues her claim is "likely outside the scope of the

arbitration agreement." But Domer's analysis of our fellow circuits' standards is faulty.

The Fifth and Sixth Circuits, like this court, do not apply a test distinct from the framework used to assess whether a claim falls within the scope of an arbitration agreement. Once the validity of the agreement has been confirmed, doubts concerning the scope of arbitrability are resolved in favor of arbitration. *See Safer v. Nelson Fin. Grp., Inc.*, 422 F.3d 289, 294 (5th Cir. 2005); *Masco Corp. v. Zurich Am. Ins. Co.*, 382 F.3d 624, 627 (6th Cir. 2004). When confronted with questions of scope, the Fifth and Sixth Circuits ask whether a claim can be maintained without reference to the contract itself. But that is only another way of examining whether there is a sufficient nexus between the subject matter of the contract and the substance of the claim. *See Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 395 (6th Cir. 2003) ("Even real torts can be covered by arbitration clauses '[i]f the allegations underlying the claims 'touch matters' covered by the [agreement].'"); *Ford*, 141 F.3d at 250–52. Either way, Domer's claims are arbitrable. As explained, the contract between Domer and Menards is an indispensable element of each claim presented. None of Domer's claims would be viable if she had not entered the paint-purchase contract with Menards. So, Domer's argument that following Fifth or Sixth Circuit precedent would show that her claims are outside the arbitration agreement is incorrect.

The general rules of contract formation, the elements of Domer's claims, and precedent assure us that the district court correctly found that Domer's claims are within the scope of the arbitration agreement.

## III

We compliment the district court for its good work in this case. Domer and Menards formed an arbitration agreement which encompasses Domer's claims. For these reasons, we AFFIRM the district court's decision.

HAMILTON, *Circuit Judge*, concurring in the judgment. Start from the intuition that there is something odd about judges looking at online user interfaces with magnifying glasses and debating font color and size and the placement of hyperlinks. This case illustrates why courts should try to rethink how we approach the issues of "click-wrap" and "browse-wrap" contracts of adhesion in online commerce. One modest step in that project would be to treat whether a "browse-wrap" user interface gives sufficient notice of hidden but hyperlinked terms and conditions as a question of fact rather than a question of law. In an appropriate case, the issue should be submitted to a jury, including in cases subject to the Federal Arbitration Act.

The issue here is one we all encounter with virtually every online purchase. Somewhere in the steps to complete the purchase, the online merchant includes on a screen a link that allows the customer to access a long statement of terms and conditions. They're written in impenetrable legalese and usually include an arbitration clause, often even purporting to waive a right to collective or class arbitration. Does anybody read them? Empirical data indicate that only two or three customers in a thousand spend more than *one second* looking at those terms.[1]

---

[1] See Yannis Bakos et al., *Does Anyone Read the Fine Print? Consumer Attention to Standard-Form Contracts*, 43 J. Legal Stud. 1, 3 (2014) (finding that 0.2 percent of consumers looked at digital terms of software license agreement for more than one second); Florencia Marotta-Wurgler, *Will Increased Disclosure Help? Evaluating the Recommendations of the ALI's "Principles of the Law of Software Contracts"*, 78 U. Chi. L. Rev. 165, 179–81 (2011) (enhanced disclosure of terms via a "click-wrap" contract increased consumer reading by only 0.36% as compared to a "browse-wrap" contract).

I address in Part I how far the realities of online commerce have drifted from the law of contracts. Part II addresses the false assumptions underlying the reasonable notice requirement. Part III addresses the realities of user-interface design and consumer behavior. Part IV summarizes how courts have been deciding these issues about the terms of contracts and argues that we should be treating them as issues of fact. Part V briefly addresses jury trials under the Federal Arbitration Act.

I.  *"Mutual Assent" in the Era of Digital Consumer Contracts of Adhesion*

The common law of contracts emerged from the paradigm of agreements between two repeat-player merchants negotiating all the terms to which both assent. Courts ask if there was a meeting of the minds, shown through evidence of objective actions and communications. E.g., *Household Utilities, Inc. v. Andrews Co.*, 71 Wis. 2d 17, 29, 236 N.W.2d 663, 669 (1976) (explaining that a "'meeting of the minds' between parties … is required to establish the existence of a contract"); *State v. Bembenek*, 2006 WI App 198, ¶ 11, 296 Wis. 2d 422, 430, 724 N.W.2d 685, 689 ("A contract is based on a mutual meeting of the minds as to terms, manifested by mutual assent." (internal quotation omitted)).

Mass retail commerce required courts to adapt that paradigm for a world of high-volume contracts of adhesion. The Supreme Court of New Jersey wrote two generations ago:

> The traditional contract is the result of free bargaining of parties who are brought together by the play of the market, and who meet each other on a footing of approximate economic equality.

> In such a society there is no danger that freedom of contract will be a threat to the social order as a whole. But in present-day commercial life the standardized mass contract has appeared. It is used primarily by enterprises with strong bargaining power and position. "The weaker party, in need of the goods or services, is frequently not in a position to shop around for better terms, either because the author of the standard contract has a monopoly (natural or artificial) or because all competitors use the same clauses. His contractual intention is but a subjection more or less voluntary to terms dictated by the stronger party, terms whose consequences are often understood in a vague way, if at all."

*Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 389, 161 A.2d 69, 86 (1960), quoting Friedrich Kessler, *Contracts of Adhesion—Some Thoughts About Freedom of Contract*, 43 Colum. L. Rev. 629, 632 (1943).

Now, in online transactions, merchants use contracts of adhesion with terms available only through hyperlinks that the consumer might or might not even notice, let alone read and understand. These online practices have taken us even further from the paradigm of contract law. Digital terms and conditions are "ubiquitous, and their terms are voluminous, onerous, and complex. Because they are practically costless to reproduce and update, businesses use them more frequently and alter them often." Nancy S. Kim, *Adhesive Terms and Reasonable Notice*, 53 Seton Hall L. Rev. 85, 91 (2022). This dynamic "creates the potential for unfair surprise, particularly when those terms are at odds with longstanding consumer

expectations and with contract law's default rules." Mark A. Lemley, *The Benefit of the Bargain*, 2023 Wisc. L. Rev. 237, 266 (2023).

Digital terms of service are contracts of adhesion. They may be described as "click-wrap" or "browse-wrap" contracts (or hybrids), in which a retailer states only that there are terms and conditions that govern a transaction and that by completing the purchase, you accept those terms. See Kim, 53 Seton Hall L. Rev. at 96 ("Online, where there is no option to sign, courts have determined that a 'manifestation of consent' could be something other than a signature; it could be a click on the icon that expresses acceptance."). The contract presented in this case is a "browse-wrap." The relevant information is not contained in the notice itself. Instead, the "notice provides *no information* other than that legal terms are available." *Id.* at 104. The consumer then has the burden of seeking out "terms behind links," and those links "do not necessarily signal whether the hidden information is important or trivial." *Id.*

Under these conditions, what happens to the meeting of the minds and manifestations of mutual assent that are the foundations of contract law? Judge Brennan's opinion for the court accurately reflects the state of the emerging case law, but those cases deserve rethinking.

Under the emerging case law, where the merchant uses a design that prevents customers from completing transactions without affirmatively "clicking" that they agree to the linked terms, courts generally enforce those terms. The so-called "click-wrap" design requires customers to decide whether they want to spend the time to review those terms. If they decide not to—usually a perfectly reasonable decision—courts

treat that choice like signing a contract without reading it. They enforce the available but unread terms of such contracts. See *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033–34 (7th Cir. 2016); accord, e.g., *Oberstein v. Live Nation Entertainment, Inc.*, 60 F.4th 505, 513 (9th Cir. 2023); *Berman v. Freedom Financial Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022); *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 75 (2d Cir. 2017); *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014); see generally *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1148 (7th Cir. 1997) ("A contract need not be read to be effective; people who accept take the risk that the unread terms may in retrospect prove unwelcome.").

The problem here is different, going under the rubric of a "browse-wrap" user interface. See, e.g., *Oberstein*, 60 F.4th at 513. Menards, like many other merchants, does not require customers to "click" that they accept the terms. Instead, Menards puts a hyperlink somewhere in the screens a customer will encounter along the path to making a purchase. Maybe the customer will notice, maybe not. When the customer completes the transaction, has she, in the language of contract law, manifested her assent to those terms? And how should courts decide?

The majority answers with what it calls "a fact-intensive legal analysis," ante at 9, citing *Sgouros*, 817 F.3d at 1034–35. The majority finds that the arbitration clause is enforceable because the Menards website provided "reasonably conspicuous notice" of the company's Terms of Order, including the arbitration clause. To reach that conclusion, the majority applies a five-factor test that considers (1) the simplicity or clutter of the screen; (2) the clarity of the disclosure; (3) the size and coloring of the disclosure's font, in the context of the rest

of the screen; (4) the "spatial placement" of the hyperlink; and (5) the temporal relationship between the hyperlink and the steps the customer must take to complete the transaction. The majority takes this test from recent case law, citing *Meyer*, 868 F.3d at 78–79, and *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 237 (2d Cir. 2016). Ante at 10.

To see the problem with this approach, take a look at the two Uber payment screenshots below, taken from cellphones. Each had a hyperlink for "Terms of Service and Privacy Policy," and each hyperlink would lead a user to terms that included a mandatory arbitration clause. But each used a "browse-wrap" technique, not requiring affirmative assent with a click. One circuit found that one screen provided users with reasonable notice that they were agreeing to a mandatory arbitration clause by signing up for the service. A different circuit found that the other did not. Compare *Cullinane v. Uber Technologies, Inc.*, 893 F.3d 53, 62–64 (1st Cir. 2018), with *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 78–79 (2d Cir. 2017). Can you tell which was which?




In coming to opposite conclusions about essentially the same user interface design, the two courts looked at the usual factors, including relative clutter on the screen, placement of the relevant warning text in proximity to the elements that users must interact with to complete the transaction, the size of that text, the color of the text in comparison to the color of other text on the page and the background, and so on.[2]

---

[2] Spoiler alert: The image on the left is from *Cullinane*, 893 F.3d at 58, where the First Circuit applied Massachusetts law and found that the linked terms were not reasonably communicated to consumers. The image on the right is from *Meyer*, 868 F.3d at 81, where the Second Circuit applied California law and found as a matter of law that the consumer agreed to the arbitration clause in the linked terms. Each appellate decision reversed the respective district court decision.

These conflicting results for functionally identical interfaces are not surprising, given what courts have been doing for almost a decade. We have been speculating about which design features will put the hypothetical "reasonable person" on "reasonable notice" that a digital purchase will bind him to a long document of legal terms and conditions. See, e.g., *Sgouros*, 817 F.3d at 1035 (courts ask whether a webpage design would "place a reasonable person on notice that there were terms and conditions attached to the purchase and that it would be wise to find out what the terms and conditions were before making a purchase" (internal quotation omitted)).

I believe this emerging multifactor test takes courts far from the law, far from judges' competence, and far from the practical realities of online commerce and user-interface design and consumer behavior.

II. *The Flawed Assumptions Underlying the Reasonable Notice Requirement*

The multifactor test the majority applies today replaces the familiar requirement of actual mutual assent with one of "conspicuous notice" or "reasonable notice." Nonetheless, it imports other assumptions from traditional contract law that do not reflect reasonable consumer behavior in online transactions. The result is that every day, many times a day, reasonable consumers give away key legal rights without realizing they have done so.

Implicit in this "conspicuous notice" or "reasonable notice" standard is a "duty to read." See Michael L. Rustad & Thomas H. Koenig, *Wolves of the World Wide Web: Reforming Social Networks' Contracting Practices*, 48 Wake Forest L. Rev.

1431, 1453 (2014) (explaining courts have expanded the longstanding contract principle of a "duty to read" to digital consumer contracts of adhesion). Courts have generally held that if there is a sufficiently conspicuous notice that binding terms and conditions exist, we assume (or our reasoning pretends) that the reasonable consumer has read them (even if doing so would be more costly than the transaction itself) and has consented to them by completing the transaction.

A "duty to read" makes sense in a negotiated transaction between sophisticated parties. But empirical studies show this fundamental assumption does not hold true when it comes to digital contracts of adhesion, particularly where user interfaces are designed to discourage consumers from reading them. As noted above in note 1, virtually no consumers read the fine print. See Bakos, 43 J. Legal Stud. at 3 (0.2 percent of consumers looked at digital terms of software license agreement for more than one second); Marotta-Wurgler, 78 U. Chi. L. Rev. at 179–81 (enhanced disclosure of terms via a "clickwrap" contract increased consumer reading by only 0.36 percent as compared to a "browse-wrap" contract).

I suspect that, as a policy matter, we do not actually want consumers to take the time to read every digital contract they make. For example, in the time it takes to read Microsoft's terms and conditions for its ubiquitous Office suite of products, you could instead read Shakespeare's *Macbeth*.[3] One estimate found it would take average Americans 250 hours each

---

[3] Nicholas LePan, *Visualizing the Length of the Fine Print, for 14 Popular Apps*, Visual Capitalist (Apr. 18, 2020), https://www.visualcapitalist.com/terms-of-service-visualizing-the-length-of-internet-agreements/ [https://perma.cc/VS83-32UM].

to read all the digital contracts to which they agree in a given year.[4] Another study found it would take the equivalent of 76 eight-hour workdays to read all the digital privacy policies (usually separate documents incorporated by reference into digital terms of service) to which the average internet user has agreed in a given year.[5] If all U.S. consumers read all the digital privacy policies they accept, one study estimated, it would cause a total productivity loss of $781 billion annually. See Aleecia M. McDonald & Lorrie Faith Cranor, *The Cost of Reading Privacy Policies*, 4 I/S J.L. & Policy Info. Soc'y 543, 563–65 (2008). Adjusted for inflation in 2024, that number would now be above $1 trillion, with a "t."

Even assuming the "reasonable consumer" is willing to devote so much time to *reading* these contracts, that does not tell us whether consumers *understand* the terms to which they are binding themselves. In an empirical test of 500 hybrid-wrap digital contracts on popular websites and applications, 99.6% were written at a reading level above that of the average adult. See Uri Benoliel & Shmuel I. Becher, *The Duty to Read the Unreadable*, Bos. Col. L. Rev. 2255, 2275, 2278–79 (2019). Microsoft's "privacy statement" runs 190 pages in print, with many hyperlinks embedded in it. One study applied a standard measure for reading difficulty and found that the privacy

---

[4] David Berreby, *Click to agree with what? No one reads terms of service, studies confirm*, The Guardian (Mar. 3, 2017), https://www.theguardian.com/technology/2017/mar/03/terms-of-service-online-contracts-fine-print [https://perma.cc/PE2L-2LBH].

[5] Alexis C. Madrigal, *Reading the Privacy Policies You Encounter in a Year Would Take 76 Work Days*, The Atlantic (Mar. 1, 2012), https://www.theatlantic.com/technology/archive/2012/03/reading-the-privacy-policies-you-encounter-in-a-year-would-take-76-work-days/253851/ [https://perma.cc/RY25-4E85].

policies on popular sites such as CNN, Zoom, Disney, Airbnb, and major league baseball were more difficult to read and understand than Immanuel Kant's notoriously dense *Critique of Pure Reason*.[6]

For an attorney or judge, spending an entire day parsing such complex legal language might be daunting but not impossible. For the average consumer who just wants to place an online order to pick up that last tool or can of paint to finish a do-it-yourself project, the reading assignment is beyond unreasonable.

The emerging legal standard is also based on an often-false assumption of choice and competition—that if a consumer is dissatisfied with a contract term, she can simply decline to complete a transaction and take her business elsewhere. See Jacques Crémer et al., *Fairness & Contestability in the Digital Markets Act*, 40 Yale J. Reg. 973, 986 (2023) ("In totally competitive markets, with totally rational consumers with no cognitive limitations, … consumers would read all the terms of the contracts proposed by the different suppliers and would be able to carry out a well-founded cost benefit analysis among the different offers. In practice, no consumer can do so."). For a modest consumer transaction like plaintiff Domer's, this assumption seems very distant from real consumer behavior.

This assumption also ignores the reality of market concentration—not just in specific industries, but with regard to the

---

[6] See Kevin Litman-Navarro, Opinion, *We Read 150 Privacy Policies. They Were an Incomprehensible Disaster.*, N.Y. Times (June 12, 2019), https://www.nytimes.com/interactive/2019/06/12/opinion/facebook-google-privacy-policies.html [https://perma.cc/29Y9-CZTZ].

terms typically included in these digital contracts. See *id*. at 980 (digital gatekeepers "have gained the ability to easily set commercial conditions and terms in a unilateral and detrimental manner for their … end users.").[7] See also Lemley, supra, at 262 ("Take it or leave it may also not be a practical option if the industry has coalesced around similar contract terms."); and Thomas D. Haley, *Illusory Privacy*, 98 Ind. L. J. 75, 79–80 (2022) (finding in survey of 222 platform terms from major websites and smartphone apps that most key terms were shared, such as allowing the platform to change the terms of the agreement unilaterally without consumer consent).[8]

III. *Real Consumers and the Science of User-Interface Design*

Given what we know about how a reasonable consumer interacts with digital contracts of adhesion, the threshold question of fair notice takes on heightened importance. The literature reviewed in Part II casts doubt on whether it is ever reasonable to enforce digital contract terms against ordinary

---

[7] The Crémer article quotes in turn Council Regulation 2022/1925, 2022 O.J. (L. 265) 1, Recital (13) ("Regulation of the European Parliament and of the Council on Contestable and Fair Markets in the Digital Sector (Digital Markets Act)").

[8] Consumers are increasingly likely to have contracted away their right to bring a consumer antitrust action against the very entity that subjected them to such binding terms. Crémer et al., 40 Yale J. Reg. at 979 (internal quotation omitted); see also Mark A. Lemley & Christopher R. Leslie, *Antitrust Arbitration and Merger Approval*, 110 Nw. Univ. L. Rev. 1, 46–47 (2015) ("Because firms with strong bargaining power can impose onerous terms on their business partners, a monopolist could make all sales contingent on the customer's agreement to waive his or her right to sue for an antitrust violation in federal court, or to bring any form of class-wide arbitration." (footnote omitted)).

consumers. Enforcing those terms is doubly unreasonable if we cannot even be sure that consumers know that they have agreed to such terms.

Reasonable notice is produced through the interaction of real consumer behavior and user-interface design choices. Plenty of data shows that (a) almost no consumers even glance at the fine print on websites, let alone click through links to review the terms and conditions, and (b) companies design their interfaces carefully to influence consumer behavior to maximize profits. Neither point is surprising. But they show that our "reasonable notice" cases on whether these interface designs result in binding contract terms bear little relation to actual consumer behavior or to the traditional contract principle of mutual assent.

Because user-interface design is technical and empirically testable, it should be possible for judges or juries to evaluate evidence as to whether or not real-life consumers are on fair notice that they have agreed to a long list of legal terms every time they complete a purchase online or download a new application on their devices. At heart, the way a reasonable consumer responds to a particular user interface is a factual issue. A plaintiff willing to present the necessary evidence may be able to show genuine disputes of material fact that can then be tried before a jury.

A. *The Realities of the "Reasonable Consumer"*

As we explained recently:

> Reasonable consumer behavior is not a matter of pure economic theory. Rather, reasonable consumer behaviors are "matters of fact, subject to proof that can be tested at trial, even if as

> judges we might be tempted to debate and spec-
> ulate further about them." In establishing rea-
> sonable consumer behavior, what matters is
> "how consumers actually behave—how they
> perceive advertising and how they make deci-
> sions."

*Kahn v. Walmart Inc.*, 107 F.4th 585, 595 (7th Cir. 2024), quoting *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 481 (7th Cir. 2020). In evaluating consumer behavior, courts must recognize that people "have limited time, computational skills, and memories, and we rationally use mental shortcuts to deal with those limits." *Id*. While *Kahn* considered state consumer protection law in brick-and-mortar stores, the same principles are relevant in considering how consumers interact with online retail sites and their contracts of adhesion.

"'[W]e have often stressed that consumers are likely to exhibit a low degree of care when purchasing low-priced, everyday items.' This low degree of care does not make consumers unreasonable—it makes them human, and even economically rational when search costs and transaction costs are included in the utility calculus." *Kahn*, 107 F.4th at 597, quoting *Bell*, 982 F.3d at 479. The low degree of care, however, "also makes them vulnerable to exploitation." *Id.* In particular:

> Predictable tendencies in consumer behavior
> mean that retail settings can be engineered to in-
> fluence consumers in ways they (meaning we)
> do not fully anticipate or appreciate. "'[M]arket
> outcomes frequently will be heavily influenced,
> if not determined, by the ability of one actor to
> control the format of information, the presenta-
> tion of choices, and, in general, the setting

> within which market transactions occur,' allow-
> ing some to 'exploit those tendencies for gain.'"

*Kahn*, 107 F.4th at 595, quoting *Honorable v. Easy Life Real Estate System*, 100 F. Supp. 2d 885, 888 (N.D. Ill. 2000), quoting in turn Jon D. Hanson & Douglas A. Kysar, *Taking Behavioralism Seriously: The Problem of Market Manipulation*, 74 N.Y.U. L. Rev. 630, 635 (1999).

These predictable tendencies in consumer behavior mean that a reasonable consumer may be more likely to overlook the existence of terms than a judge engaged in a careful examination of a single user interface. Extrapolating from our own experiences as busy consumers risks undervaluing the unconscious processes and conditions that shape consumer decision-making.

B.  *User-Interface Design and Consumer Behavior*

Do these realities matter? The businesses seeking to enforce digital contracts certainly believe they do. Just as brick-and-mortar supermarkets stock higher-margin items at eye-level to nudge shoppers into spending more, see *Kahn*, 107 F.4th at 596 n.3, online retailers strategically place and format certain information (while obscuring other information) to influence consumer behavior.

User-interface design experts focus carefully on how the details of a digital interface influence users' interactions with it. See Jamie Luguri & Lior Jacob Strahilevitz, *Shining a Light on Dark Patterns*, 13 J. Legal Analysis 43, 48 (2021) ("e-commerce[] firms run thousands of consumers through identical interfaces at a reasonable cost and see how small software tweaks might alter user behavior"); Colin Gray et al., *The Dark (Patterns) Side of UX Design*, In Proceedings of the 2018 CHI

Conference on Human Factors in Computing Systems (CHI '18), Association for Computing Machinery, Paper 534, 2 (2018) (user-interface design is "inherently a persuasive act").

Research can measure how various features change the likelihood of consumers taking certain actions when using a website or application. "Choice architects have long understood that contrasting visual prominence can be used to nudge choosers effectively into a choice the architect prefers." Luguri & Strahilevitz, 13 J. Legal Analysis at 55. For example, one study found that the most effective design strategies include "hidden information" and "smaller print in a less visually prominent location." *Id.* at 47. In a controlled study, such a design choice doubled the number of consumers willing to complete a purchase. *Id.* at 73–75. The authors of the study concluded that such design choices "might cause consumers to misunderstand material terms of a contractual offer they have just accepted." *Id.* at 94; see also Gray et al., supra, at 7 (explaining that the "primary motivator behind hidden information is the disguising of relevant information as irrelevant"). These authors could have been describing Menards' design and placement of its hyperlink to the terms and conditions at issue here.

If businesses like Menards invest in designing their user interfaces "to influence the behavior of real consumers," courts should not allow them to enforce hidden contract terms with arguments that "assume consumer behavior in idealized markets with '*perfect* information, *perfect* competition, and *no* transactions costs.'" *Kahn*, 107 F.4th at 597, quoting *Honorable*, 100 F. Supp. 2d at 888. Like them, "we should consider the behavior of real consumers instead of Adam Smith's *homo economicus*." *Id.*

These empirical studies on consumer behavior in response to a particular user interface are exactly the type of evidence an expert could present to a jury to show that a consumer did or did not have notice of the terms and conditions found on a digital website. The evidence might show, for example, that the interface has been designed to distract or mislead the consumer, or at least to manipulate the consumer into proceeding without bothering to look at the terms of the contract of adhesion.

IV. *The Multifactor Test — Law or Fact?*

As noted, the majority enforces the arbitration clause in Menard's terms and conditions by applying "a fact-intensive legal analysis" that considers (1) the simplicity or clutter of the screen; (2) the clarity of the disclosure; (3) the size and coloring of the disclosure's font, in the context of the rest of the screen; (4) the "spatial placement" of the hyperlink; and (5) the temporal relationship between the hyperlink and the steps the customer must take to complete the transaction. Ante at 10.

I have been tempted to disagree with the majority's application of this multifactor test, which requires the decisionmaker to study high-resolution screenshots of various user interfaces. On further consideration, though, I concluded that such a debate would not be useful. First, plaintiff Domer chose to litigate this case without trying to raise material factual disputes about fair notice. That's why I concur in the judgment here. Second, and more fundamental, the prospect of debates among judges about such details of a user interface as font size and color and the exact placement and labels for hyperlinks to incomprehensible fine print shows, in my view, that we need to think about these problems in a different way,

one that is more consistent with older approaches to contract formation.

As Justice Kagan said recently, "we're a court. We really don't know about these things. You know, these are not like the nine greatest experts on the internet." Transcript of Oral Argument at 45–46, *Gonzalez v. Google*, 598 U.S. 617 (2023). The same is true of the judiciary as a whole. More specific to this case, judges are not experts in the highly specialized and technical fields of user-interface design and human-computer interaction. I suspect few judges know much about the fields beyond our experience as consumers.

Rather than debating among ourselves our impressions about font size and color, the placement of hyperlinks, and the choice between click-wrap and browse-wrap agreements, we should start treating these issues about user-interface design as questions of fact. We should invite sufficiently motivated parties to test alternative designs and to conduct discovery into merchants' actual design choices. If judges will not do so, then legislators and/or consumer-protection agencies should consider stepping in with more specific disclosure requirements and regulatory safe harbors.

I recognize that there may be room to debate whether the contract terms in online commerce result from a race to the bottom or a race to the top. Proponents of the browse-wrap interface design might well assert that busy consumers prefer not to be bothered with detailed contract terms they don't care about, and that competitors' common terms and conditions reflect an evolution toward an efficient solution to common issues. Those assertions may be true, but they are assertions of fact, subject to empirical proof and rebuttal.

Advocates of treating these problems as questions of law might also argue that treating them as questions of fact would invite expensive and inconclusive battles of experts. Online merchants would be left guessing how to design their user-interfaces to secure enforceable terms. To some extent, those risks are a tradeoff chosen by online merchants who wish to bind consumers to digital contracts of adhesion through browse-wrap agreements. Merchants could avoid much of the uncertainty of litigation by using click-wrap agreements, which are usually enforced.

Moreover, those risks do not change the inherently factual nature of the questions. Nor do those risks justify having judges apply their own experience as consumers to decide factual questions that, in the real world of online commerce, are the subject of genuinely expert study and design. If a plaintiff is willing to invest in the needed expertise, courts and juries should listen. Another alternative, more likely to offer clearer rules, would be for legislatures or consumer-protection agencies to establish more specific guidelines for enforcing terms and conditions for consumer transactions. Legislatures and agencies are also better positioned to craft rules that address the false assumptions underlying the reasonable notice requirement.

In any event, the foundation of contract law is mutual assent. How can there be a meeting of the minds if the average person has (quite reasonably) never seen, let alone read and understood, the contract terms? Or if consumers are functionally deprived of an opportunity to opt out of the binding terms? It would be virtually impossible to navigate our modern world without binding yourself to click-wrap and browse-wrap contracts, yet empirical data show that only a

vanishingly small segment of consumers can give anything approaching meaningful consent to their terms. Courts should account for those realities in deciding these disputes over contract terms.

V.  *Jury Trials on Contract Formation under the FAA*

Finally, this reasoning points toward trying before juries whether to enforce hyperlinked arbitration clauses in online contracts of adhesion. Under the Federal Arbitration Act, courts must look to state contract law to determine whether such an agreement exists and is valid. See *Tinder v. Pinkerton Security*, 305 F.3d 728, 733 (7th Cir. 2002). Under the FAA, if a court finds a material factual dispute as to whether an agreement to arbitrate was made, it "shall proceed summarily to the trial thereof." 9 U.S.C. § 4.

"The burden is on the party opposing arbitration to "identify a triable issue of fact concerning the existence of the agreement in order to obtain a trial on the merits of the contract." *Tinder*, 305 F.3d at 735. Whether there is a meeting of the minds to form a contract is generally a question of fact under Wisconsin contract law. See *National Steel Serv. Ctr., Inc. v. Wollin Silos & Equip., Inc.*, 92 Wis. 2d 133, 138, 284 N.W.2d 606, 609 (1979) ("Whether there is an intent to make a contract is a question of fact, which must be ascertained from the parties' words and actions."); *Household Utilities, Inc. v. Andrews Co.*, 71 Wis. 2d 17, 28, 236 N.W.2d 663, 669 (1976) ("There is no meeting of the minds where the parties do not intend to contract and the question of intent is generally one to be determined by the trier of fact."); *Ginsu Prods., Inc. v. Dart Indus., Inc.*, 786 F.2d 260, 262 (7th Cir. 1986) (applying Wisconsin law and explaining that the intent to be bound is a question of fact). A party who seeks a jury trial on whether an arbitration

agreement exists must request it specifically and quickly to comply with section 4 of the FAA, 9 U.S.C. § 4.

Ultimately, however, because plaintiff Domer did not try to raise any genuine issues of material fact here, I concur in the judgment affirming dismissal of her case.